SPIELMANN, Appellant, vs. INDUSTRIAL COMMISSION and another, Respondents. (No. 104.)
HAMKINS, Appellant, vs. SAME, Respondents. (No. 103.)
MILKENT, Appellant, vs. SAME, Respondents. (No. 105.)

*November 6—December 3, 1940.*

242

For the appellants there were briefs by *Max Raskin,* attorney, and *Wm. F. Quick* of counsel, both of Milwaukee, and oral argument by *Mr. Quick.*

*Stanley Rector* of Madison, for the respondent Industrial Commission.

For the respondent Nash-Kelvinator Corporation in No. 104, there was a brief by *Lines, Spooner & Quarles,* attorneys, and *Leo Mann* of counsel, all of Milwaukee, and oral argument by *Mr. Mann.*

*Horace J. Mellum* of Kenosha, for the respondent Nash-Kelvinator Corporation in Nos. 103 and 105.

Fowler, J. The defendant Nash-Kelvinator Corporation is engaged in a variety of manufactures, among them the manufacture of Nash automobiles. It owns plants at Milwaukee, Racine, and Kenosha. The plaintiff Spielmann was employed in the Milwaukee plant, plaintiffs Hamkins and Milkent in the Kenosha plant. All three plaintiffs lost employment by reason of the shutting down of the plants in which they were respectively engaged. They applied to the Industrial Commission for unemployment compensation under ch. 108, Stats. The Spielmann case will be first considered.

The act provides for payment to the state by each employer who is subject to the act of a certain percentage of his pay roll. The accumulated payments are credited to an individual fund of the employer who makes them. The state from the individual fund so accumulated pays unemployment compensation to employees of the employer who accumulates the fund who lose their employment and who are eligible to receive unemployment compensation under the terms of the act. The Industrial Commission administers the act. The commission denied compensation to the plaintiffs because it considered that they were ineligible under sec. 108.04 (5) (a) of the act, which reads:

"An employee who has . . . lost his employment with an employer because of a strike or other *bona fide* labor dispute shall not be eligible for benefits from such . . . employer's account for any week in which such strike or other *bona fide* labor dispute is in active progress in the establishment in which he is or was employed."

The Industrial Commission denied compensation under this statute on the ground that the Milwaukee and Kenosha plants constituted an "establishment" within the meaning of this statute because "of the physical proximity, functional integrality and general unity" of these plants.

It was stipulated at the hearing that the employees of the Kenosha plant "went on strike Monday morning, October 2, 1939, and thereby caused the shutting down of the said Kenosha plant" on the morning of that day, and "the shutting down of said Milwaukee plant" at 10 o'clock a. m. of that day; that said strike was a strike or other *bona fide* labor dispute which was in active progress to October 20th and the Milwaukee plant resumed operations on October 23d. Upon this stipulation and the finding that the Milwaukee and Kenosha plants constituted an "establishment" the commission determined that the plaintiff was ineligible to compensation under par. (a) of said section.

The evidentiary facts upon which the commission found the Milwaukee and Kenosha plants constituted a single "establishment" are without dispute. They were summarized by the commission as set out in the margin.[1]

---

[1] The employer is a Maryland corporation and is engaged in, among other things, the manufacture of automobiles. It has a body plant in Milwaukee and an assembly plant at Kenosha. The employee worked at the Milwaukee plant.

The Milwaukee plant is devoted exclusively to the manufacture of bodies for the several models of the employer's cars. The Kenosha plant is devoted exclusively to the manufacture of parts other than bodies, and to the assembly of the completed cars. There are no other plants of the employer engaged in automobile manufacture.

Ninety-eight per cent of the cars are built against specific orders. Because of the numerous possible combinations in model, color, trim, accessories, etc., it is necessary that production schedules be carefully planned in advance. Accordingly the work of both plants is projected on a monthly, weekly and daily base by a central planning department located at the Kenosha plant. The production in each plant is highly synchronized and the work of the two plants is so co-ordinated that a body built in the Milwaukee plant against a given car order will meet the chassis built in the Kenosha plant against the same order, pursuant to a prearranged schedule. It is endeavored to keep the hourly rate of production of the two plants the same.

The two plants are approximately forty miles apart. The bodies are transferred from the Milwaukee plant to the Kenosha plant by trucks owned by the employer and driven by its employees. The

It appears from this summary that although the two plants were forty miles apart, they were just as much a single establishment for the manufacture of automobiles as they would have been had they been in two buildings adjacent to each other, or in separate parts of the same building. Upon this finding and the stipulation above stated the commission concluded that the plaintiff "lost his employment because of a *bona fide* labor dispute" which "remained in active progress in the establishment" during the term of plaintiff's unemployment within the meaning of sec. 108.04 (5) (a), Stats.

The appellant urges eight facts that he claims show that the two plants do not constitute a single establishment: (1) "The plants are forty miles apart." This is covered above. (2) "Each has its own separate wage and labor contract." But each craft in a single plant may also have these. (3) "Each has its own seniority and service records." So has each craft in a single plant. Seniority rights in one craft give an employee no rights in any other craft. (4) "Each has its own local union to represent it." So may each craft in a single plant. (5) "Negotiations for working conditions in one are carried on without contact with the other." So it may be as to each craft, or a separate department in a single plant. (6) "An employee of one plant has absolutely no standing in the other." Also an employee in one craft in a single plant has no standing in any other craft. (7) "Each has its own hiring and firing department." So may each department in a single plant. (8) "In each, the individual employee, his work, his tools, his hiring and discharge, his immediate relationship with his employer, is

---

employer has a general works manager in charge of the operation of the two plants.

Because of the functional integrality, general unity and physical proximity of the two plants it is found that they constitute a single "establishment."

separate and distinct." So they may be as to different crafts or departments in a single plant. As the same situations may exist as to different crafts or departments in a single plant, none of the things stated, and all of them together, seem to us not to control the matter.

The public-policy declaration of the statute is relied on as somehow affecting the question. We do not see anything in the declaration inconsistent with the decision of the commission. May be the statute does not afford the best means of effecting its purpose. May be administration of it fails to afford employees in different situations the same rights to compensation. But this does not defeat the statute, or compel or permit departure from or violation of the terms of the statute in awarding compensation. As the law is written, so must it be administered, although its administration in some situations denies compensation for loss of employment resulting from no fault of the employee and the loss is beyond his power to prevent.

Much is made by appellant of giving to the word "establishment" its ordinary meaning. A multitude of meanings of the word is given in the dictionaries. In Webster, one of these meanings is a "permanent commercial organization;" another is "a manufacturing establishment." Both of these definitions fit the instant situation. The two plants manifestly constitute an establishment for the manufacture of automobiles, else the company has no establishment for their manufacture.

Rules of statutory construction are relied on by both parties. There is no dispute as to what these rules are. No one of them may be relied on to the exclusion of others. The purpose of the statute must be considered and the statute must be construed to effect that purpose, if it is discoverable, if such construction is possible. Manifestly the language of the act itself must be considered. In the instant act we find in sec. 108.01, Stats., that it is "the employer"

upon whom the burden is placed to accumulate the fund out of which benefits are to be paid; that it is "industrial and business units," that shall pay the part of the social cost of unemployment imposed on employers; and that it is "the company" that can reasonably be required to accumulate the fund; it is the "employer" that is by provisions of the act encouraged to furnish steady employment. All these declarations of purpose point to the construction of the statute reached by the commission. It is also to be noted that the fact that an employee is not himself at fault for his loss of employment is not the sole reason for suspension of benefits. Par. (b) of sec. 108.04 (5) provides for such suspension in case the loss of employment is caused by "act of God, fire, or other catastrophe, or act of civil or military authority, directly affecting the place" of employment. As well may suspension result from ineligibility to compensation.

It is suggested that the use of the word "in" instead of "by" in the clause "establishment in which he is or was employed" indicates that the word "establishment" was used in the sense of a definite place. Perhaps the use of "by" would have more emphasized the fact that the word "establishment" was used in a comprehensive rather than a restricted sense, but we consider that the use of "in" does not preclude the meaning given to par. (a) of the statute by the commission. Legislatures cannot be conclusively presumed to have used such fine discrimination in their use of prepositions. The meaning of the word "establishment" is to be drawn from the whole act rather than from so insignificant a thing as a single preposition. We consider that the conclusion of the commission must be sustained.

In the cases of Hamkins and Milkent the plaintiffs lost their employment on September 26, 1938. At that time there was no strike at Kenosha. There was, however, labor trouble in the Racine plant on and prior to September 26th

that the commission found constituted "a *bona fide* labor dispute" in active progress within the meaning of par. (a) of said section. The facts constituting this *bona fide* labor dispute in active progress were summarized by the commission as stated in the margin.[1]

This trouble, referred to in the summary as a blockade, was caused by the determination of the defendant company to close the Racine plant and do all the work of manufacture and assembling of cars at the Kenosha plant. The effect of this blockade was to prevent the company from moving to Kenosha manufactured parts on hand at Racine, the materials there on hand for the manufacture of such parts as were manufactured there and the machinery there located for the manufacture of such parts. This prevented the company from continuing the manufacture and assembly of its

---

[1] The employer is engaged in the manufacturer of automobiles. It has a body plant at Milwaukee and assembly plants at Racine and Kenosha. Prior to the 1939 model year the three plants were synchronized and operated as a unit. The Milwaukee plant built bodies for all of the cars, the Racine plant assembled the company's low-priced car, and the Kenosha plant assembled a complete line of the employer's cars, including the low-priced car. The Racine and Kenosha plants were interdependent—each producing many of the parts needed by, but not produced by, the other. These two plants are approximately ten miles apart and the parts were transferred between them by motor truck.

On August 19, 1938, the employer notified its Racine employees that because of business conditions it had decided to close down the Racine plant for at least the 1939 model year and to transfer the activities of that plant to its Kenosha plant.

On August 22d, members of the Racine local union posted groups of pickets at the gates of the Racine plant for the purpose of preventing the movement of tools, materials and equipment to the Kenosha plant. This picketing was maintained on a 24-hour a day basis until the difficulty was settled on October 9, 1938. Being dependent on the Racine plant for numerous parts, the Kenosha plant was unable to operate properly because of the Racine blockade. Hundreds of employees who normally would have been called back to their jobs were not called back, and finally, because of an unbalanced inventory and an inability to produce cars at Kenosha due to the blockade, the Kenosha plant was shut down on September 26, 1938. It was not reopened until after the settlement of October 9, 1938.

cars at Kenosha, and caused the closing of that plant. The plant was opened at Kenosha when the Racine trouble was settled and the employees involved were then called back to work.

In the Hamkins and Milkent cases the Milwaukee plant is not involved. In these cases the plants of the company in Racine and Kenosha were found to constitute a "single establishment" within the meaning of sec. 108.04 (5) (a), Stats. They were so found in view of their "physical proximity, functional integrality and general unity." Obviously as to "physical proximity" if under the circumstances of the Spielmann case the forty miles distance between Milwaukee and Kenosha did not defeat "physical proximity," the ten miles between Racine and Kenosha did not. The findings of "functional integrality and general unity" in these cases rests on facts somewhat different from those involved in the Spielmann case, but the bearing of these facts on "functional integrality and general unity" is precisely the same.

It is contended by the appellants that the trouble at Racine did not prevent the removal to Kenosha of the machinery, parts, and material, and that that trouble did not cause the plant at Kenosha to shut down on September 26th. But the finding of the commission on questions of fact are conclusive if there is any credible evidence to support them. Secs. 102.23, 108.09 (7), Stats. We consider that there is evidence from which the commission might properly find both facts above referred to.

However it may be as to the picketing at the Racine plant not being technically a strike, because it did not involve a voluntary quitting of work by the employees, it constituted a "labor dispute" within the meaning of the act. It was ordered by the local labor union. It was based upon the contention of the union and the employees of the Racine plant that the company should not remove the machinery of

the Racine plant to Kenosha or cease the operation of the Racine plant, but should continue to operate that plant although its operation resulted in loss to the employer. It is true that there was no legal basis for the contention of the union and the employees that the machinery and parts and material should not be removed, but labor disputes may and do exist in absence of legal basis for the contentions made. The picketing was resorted to to compel the company to refrain from doing what it was proposing to do in order that the employees might preserve their jobs and their opportunity to work. The contention of the employees was, in effect, that they had a moral right to retention of their jobs whatever the legal aspect of the situation might be, and thus had a moral right to picket the plant and by show of force compel the company to yield to their demands.

It is to be noted that the term "labor dispute" as used in ch. 108, Stats., the Unemployment Compensation Act, is not to be construed as defined in the present labor relations act, ch. 111, Stats. 1939, or any other such act. Ch. 108 was enacted by ch. 20, Laws of Sp. Sess. 1931, and the 1939 definition could not possibly have been in the mind of the 1931 legislature. No more could the definitions in or construction under any other labor relations acts, all which acts were enacted subsequent to 1931. The meaning of the term in ch. 108 must be determined by what the legislature intended by it. If any statutory definition is to be considered in determining that meaning, it is the definition contained in the statutes in force at the time the act was passed. Sec. 268.29 (3), Stats. 1931, defines "labor disputes," among other things, as including "any controversy concerning . . . employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee." The picketing

here involved was clearly the result of a labor dispute within the meaning of the term as above defined.

In the Hamkins and Milkent cases a point is involved not in the case of Spielmann. In the negotiations for settlement of the trouble at Kenosha the company agreed with the Kenosha employees that they should receive unemployment benefits after having first made answer before the commission that the employees were not entitled to such benefits.

The commission refused to approve this waiver, claiming no power to approve it under provision of sec. 108.04 (8) (a), Stats. 1937, which applies to the instant case. This paragraph provides respecting waiver:

"(8) (a) *Option to waive restrictions.* Any employer subject to this chapter may at any time, with notice to and written approval by the commission, for any stated period of twenty-six weeks or more waive or modify the application to his employees of any provision denying or limiting benefit payments under this chapter, but solely to permit his account to pay additional benefits under conditions equitable to all his employees. Such waiver or modification may at any time be terminated, by the employer after due notice to the commission and with its written consent, or by the commission after due notice to the employer if found inequitable to his employees."

It is to be noted that by the paragraph quoted the waiver covered is limited to one of twenty-six weeks or more, that notice must be given to the commission, that such waiver must have the written approval of the commission, and that the waiver can be made only in case that it is equitable to all the employees to deplete the benefit account by the waived payments.

No notice whatever was given to the commission in the instant case. Twenty-six weeks or more is not involved. The commission did not consent thereto in writing, and it

does not appear that it would be equitable to all the employees of the company to deplete the fund by making the payments. As to the "equity" essential to warrant approval by the commission of a waiver by an employer of withholding benefits the commission says:

"This employer's account was in fact exhausted at the time of the attempted waiver. In effect, therefore, any benefits paid under the proposed waiver, even though charged against the employer's account, could not actually be paid from and financed by 'his account,' which was already overdrawn. Any such overdraft payments would in effect have been paid from and financed by the general 'balancing account' of the unemployment reserve fund, to the possible prejudice of many other workers throughout the state."

It appears from the above that the commission was correct in not approving the waiver offered by the company, and that payment of benefits cannot be made to the plaintiffs, Hamkins and Milkent.

*By the Court.*—The judgments of the circuit court are affirmed.