## JOSEPH L. TUCKER, ET AL. *v.* AMERICAN SMELTING & REFINING CO.

[No. 11, October Term, 1947.]

*Decided  November  13,  1947.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Isador Roman* and *I. Duke Avnet*, with whom were *Jacob J. Edelman, Mitchell A. Dubow* and *Edgar P. Boyko* on the brief, for the appellants.

*Paul M. Higinbotham* and *Paul R. Kach* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by eight claimants for unemployment compensation, from an order reversing a decision of the Unemployment Compensation Board, which allowed compensation for a period from and after February 25, 1946. The briefs and oral arguments in this court, and the opinions of the lower court and the Board, cover a wide range of questions of law and fact. Our view of the case makes it unnecessary to discuss or mention many of these questions or the facts pertaining to them. It will, however, be necessary to consider some facts regarding particular employees.

The basic questions presented are, (1) whether within the meaning of section 5(d) of the Unemployment Compensation Law, Code Supp. 1943, Article 95A, which disqualifies an individual for benefits in specified circumstances, claimants' unemployment was due to a stoppage of work which existed because of a labor dispute "at the factory, establishment, or other premises" at which they were last employed, and (2) if it was, whether section 5(d) is inapplicable because of the proviso in that subsection. The Board answered the first question in the negative and held claimants not disqualified. If this finding of fact is supported by substantial evidence, it is conclusive and the second question is immaterial. Art.

95A, sec. 14(c) ; *Heaps v. Cobb,* 185 Md. 372, 380, 45 A. 2d 73; *Lewis v. Cumberland,* 188 Md. 58; 54 A. 2d 319, 324. In stating the material facts, therefore, we must ignore opposing evidence (if any) and state as facts evidence most favorable to the Board's findings.

Employer is engaged in smelting and refining copper. It owns eighteen or more plants (mines, smelters and refineries) in various states, including a smelter at Garfield, Utah, and a refinery at Baltimore. "Blister" copper, smelted at Garfield, is refined at Baltimore. Claimants were employed at the Baltimore refinery. Employees at Baltimore, Garfield and sixteen other plants respectively were members of nineteen local C.I.O. unions and were represented by these unions as bargaining agents. The members of the local unions were, as such, members of one "international" union. In November and December, 1945, a "council" of these nineteen local unions was organized for the purpose of national bargaining for all the unions with the employer. For a number of years it has been a purpose of the international union to achieve "national bargaining," but it has been completely unsuccessful in its attempt to do so. In December, 1945, the employer, by a letter from the chairman of its board to the vice-president of the international union and director of the council, refused to grant a request for national bargaining and said, *inter alia,* "The plant manager, who is directly responsible for the success or failure of the enterprise of which he has charge, is, we believe, the proper person to negotiate the terms and conditions of the labor agreement applicable to the plant." The council tried to "synchronize" wage negotiations—and strikes and threats of strikes—on the part of all nineteen unions. Three Utah unions (two at Garfield), which had taken a strike vote under the Smith-Connally Act, 50 U. S. C. A. Appendix, sec. 1501 *et seq.,* before the council was organized, and which claimed that the issues in dispute in Utah were different from those in other states, refused to cooperate in such synchronization, and went on strike on January 21, 1946.

Later the council took a strike vote of the sixteen other unions, and the sixteen went on strike on February 25, 1946. This strike, the lower court says, continued until June 19, 1946. During the Utah strike Baltimore employees paid their regular union dues but made no contributions to finance the strike. While they were laid off or were on strike they paid no dues.

From time to time from February 4, 1946, to February 23, 1946, employer laid off a large number of its Baltimore employees because of lack of work. Each employee so laid off was sent a letter from employer stating that: Conditions had made it necessary to give him a "furlough"; the Garfield plant, "which supplies the copper for this refinery, is now shut down due to a strike" called by the international union, which became effective January 21, 1946; and "the last copper from Garfield arrived here on February 4, 1946." Regret was expressed that these circumstances "have forced us to gradually reduce our working force, but there is nothing else we can do. You will be notified promptly when the strike in Utah is over and we are ready to start up your department again." In the formal "separation notice" sent by employer to each employee laid off "lack of work" and not "labor dispute" was checked as the "reason for separation."

No claim is made on behalf of employees who ceased work when the Baltimore strike began, on February 25, 1946. Nor does the Board's decision—or the appeals to the lower court and to this court—cover any question as to the right of claimants to compensation from the time they were laid off until February 25, 1946. The lower court, however, held that claimants were not entitled to compensation (already paid them) for the period from February 4, 1946, to February 25, 1946. We find no basis for the court's action in this respect or for employer's contention that this question was or is properly at issue below or in this court.

Assuming that claimants' unemployment was originally due to a stoppage of work which existed because

of a labor dispute at the Garfield plant, the question arises whether the Garfield plant and the Baltimore plant were one "establishment" within the meaning of section 5(d), *i. e.,* whether the Garfield plant was the "establishment" at which claimants were last employed. The lower court found that the Garfield and Baltimore plants constituted one establishment.

In *Spielmann v. Industrial Commission,* 1940, 236 Wis. 240, 295 N. W. 1, cited by the lower court and by employer, the commission found, and it was undisputed, that: An automobile manufacturer had a body plant at Milwakee and an assembly plant at Kenosha, forty miles away. The one plant was devoted exclusively to the manufacture of bodies for several models of cars; the other exclusively to manufacture of other parts and assembly of the completed cars. Ninety-eight per cent of the cars were built against specific orders. Because of the numerous possible combinations in model, color, trim, accessories, etc., it was necessary that production schedules be carefully planned in advance. Accordingly the work of both plants was projected on a monthly, weekly and daily basis by a central planning department at the Kenosha plant. The production in each plant was highly synchronized and the work of the two plants so coordinated that a body built at Milwaukee against a given car order would meet the chasis built at Kenosha against the same order, pursuant to a prearranged schedule. It was endeavored to *keep the hourly rate of production of the two plants the same. The bodies were transported from Milwaukee to Kenosha by trucks owned by the manufacturer and driven by its employees. The manufacturer had a general works manager in charge of the operation of the two plants.* (Italics supplied.) The commission concluded: "Because of the *functional integrality, general unity and physical proximity* of the two plants it is found that they constitute a single 'establishment.'" (Italics supplied.) *Supra,* 236 Wis. 244, 245, 295 N. W. 4. The court, sustaining the commission's finding, said: "It appears from this summary

that although the two plants were forty miles apart, they were just as much a single establishment for the manufacture of automobiles as they would have been had they been in two buildings adjacent to each other, or in separate parts of the same building." *Supra,* 236 Wis. 245, 295 N. W. 4. "The two plants manifestly constitute an establishment for the manufacture of automobiles, else the company has no establishment for their manufacture." *Supra,* 236 Wis. 246, 295 N. W. 4.

Comparison with the facts in the *Spielman* case shows the absence of evidence that the Garfield and Baltimore plants, because of "functional integrality," "general unity" or "physical proximity," constitute a single "establishment." Plant managers, or even workmen, may commute forty miles to and fro daily. It would be futile to attempt to fix a precise limit (whether 2000 miles, or more or less) of "physical proximity." It is sufficient that in the ordinary use of words a plant at Garfield and one at Baltimore would not be called one "establishment" and facts are lacking which might give a special and unusual application to the word "establishment." *Cf. Matson Terminals, Inc., v. California Employment Commission,* 24 Cal. 2d 695, 707, 151 P. 2d 202. There is no evidence of more "functional integration" than there is in the case of any manufacturer who might regularly buy materials and supplies from certain suppliers, *e. g.,* metals from Canada, coal from West Virginia or power from Baltimore. At all events the evidence is sufficient to support the Board's finding that the Garfield and Baltimore plants were not one "establishment."

*Chrysler Corp. v. Smith,* 1941, 297 Mich. 438, 448-449, 298 N. W. 87, 135 A. L. R. 900, also cited by the lower court and by employer, follows the *Spielman* case and is similar on the facts, but the "physical proximity" of the plants was greater, *i. e.,* all were in the Detroit area, and the Dodge Main Plant was within eleven miles of the others. Most of the manufacturing operations were "functionally integrated and highly synchronized with

the production of the Dodge Main Plant." *Supra*, 297 Mich. 444, 298 N. W. 89, 135 A. L. R. 900.

*Unemployment Compensation Commission v. Aragon*, 329 U. S. 143, 91 L. Ed. 136, 67 S. Ct. 245, involved no question whether two plants constituted one establishment. The court merely sustained the commission's finding that there was a labor dispute at Alaskan establishments, though the negotiations were conducted at Seattle.

The evidence indicates that, if asked to return to work, all the claimants probably would have actively participated in the Baltimore strike by refusing to cross the picket line. *Brown v. Maryland Unemployment Compensation Board*, 189 Md. 233, 55 A. 2d 696, just decided. However, (with the exception hereafter mentioned) claimants' unemployment was due directly to lack of work before the Baltimore strike and not to stoppage of work because of the Baltimore strike. Claimants therefore are not disqualified for benefits under section 5(d). *Cf. Muncie Foundry Division v. Review Board*, 1943, 114 Ind. App. 475, 485, 51 N. E. 2d 891, in which (as the Board says) it was held that if unemployment is originally caused by lack of work and a labor dispute develops during the continuance of the unavailability of work, such labor dispute does not disqualify the employee from benefits until work becomes available and he refuses to work because of the labor dispute. By the same token, a former employee would not be entitled to workmen's compensation for an accident by which he would have been injured if he had not been laid off.

The lower court's opinion is based largely on the "declaration of policy," in section 2 of the Law, that the unemployment reserves are to be used for the benefit of "persons unemployed through no fault of their own," and a finding by the court that after February 25, 1946 claimants were unemployed "because of their own fault." In *Walter Bledsoe Coal Co. v. Review Board, etc.*, 1943, 221 Ind. 16, 20, 21, 46 N. E. 2d 477, 479, the corresponding provision in the Indiana statute was considered in

connection with the provision for disqualification because of a labor dispute. The court held that "fault" does not mean "something worthy of censure," but "must be construed as meaning failure or volition." Quoted with approval, *Board of Review v. Mid-Continental Pet. Corp.,* 193 Okl. 36, 39, 40, 141 P. 2d 69. We have had occasion to refer to section 2 as "a guide for the interpretation and application" of the law. *Celanese Corporation of America v. Davis,* 186 Md. 463, 47 A. 2d 379, 381; *Maryland Unemployment Compensation Board v. Albrecht,* 183 Md. 87, 36 A. 2d 666. We have, however, held that if the language of the law is plain and free of ambiguity, the meaning of the language is the meaning of the Legislature. *Saunders v. Maryland Unemployment Compensation Board,* 188 Md. 677, 53 A. 2d 579, 581. Section 5(d) deals explicitly with the subject of disqualification for benefits because of a labor dispute. We are not at liberty to construe the negative words of section 2, "through no fault of their own," as an affirmative disqualification for "fault," without regard to the express provisions of section 5 (d). If there is incongruity between the "general policy" in section 2 and the result of particular provisions in section 5(d), the incongruity may be eliminated only by the Legislature.

The order of the lower court must therefore be reversed—except in respect of claimant Tucker who testified that when the Baltimore strike began he agreed to do, and later did do, "picket duty." An individual, to be eligible to receive benefits, must be "able to work and is available for work." Section 4(c). He is disqualified for benefits if "his unemployment is due to a stoppage of work which exists because of a labor dispute at the * * * establishment * * * at which he is or was last employed" and he is "participating in * * * the labor dispute." Section 5(d). We have held that, "The purpose of the statute was to alleviate the consequences of involuntary employment. It was not intended to penalize or subsidize either employees or employers,

lawfully engaged in a labor dispute." *Saunders v. Maryland Unemployment Compensation Board, supra.* When Tucker thus voluntarily and actively participated in the Baltimore strike by agreeing to do and doing "picket duty," we think he thereby made himself "unavailable for work," (*cf. Board of Review v. Mid-Continental Pet. Corp.,* 193 Okl. 36, 41, 141 P. 2d 69), and made his own strike and stoppage of work the direct and proximate cause—or a direct and proximate cause—of his own continued unemployment, notwithstanding the relation between the previous Garfield strike and his previous unemployment. He ceased to be a victim of the Garfield labor dispute and became an active partisan in the Baltimore labor dispute. As a voluntary active party to the Baltimore labor dispute, he is not entitled to be subsidized by unemployment benefits. His case on its facts is in sharp contrast with cases in which members of no union (*Kieckhefer Container Co. v. Unemployment Compensation Commission,* 1940, 125 N. J. L. 52, 54, 13 A. 2d 646), or of a union not cooperating with the striking union (*Department of Industrial Relations v. Drummond,* 1941, 30 Ala. App. 78, 1 So. 2d 395; *Wicklund v. Commissioner of Unemployment Compensation,* 1943, 18 Wash. 2d 206, 138 P. 2d 876, 148 A. L. R. 1298), were held entitled to compensation.

Only eight claimants are parties to this appeal. Their claims were disallowed by the claim examiner. Section 6(c). His decision was reversed by the Board. Section 6(f). The Board's decision in turn was reversed by the lower court. Employer's counsel says approximately 480 claimants' status "will be determined by this appeal". The record does not disclose the present status of the four hundred and more claims. It does not clearly show who were parties to the appeals from the examiner to the Board. The appeal to the lower court was taken against eight named claimants, who however professed to answer "on their own behalf and for and on behalf of all other employees similarly situated". Though the other four hundred claimants are not before us, we may

say that three of them testified and showed themselves not entitled to compensation, one, DeMario, because he did "picket duty," and two, Ross and Davidson, because they were not "laid off" before the Baltimore strike.

> *Order affirmed as to appellant Tucker (as to compensation from and after February 25, 1946) and reversed as to the other appellants, costs above and below to be paid one-eighth by appellant Tucker, seven-eighths by appellee.*