Heffernan, J.
These two cases present the same question of law, were argued together and will he decided simultaneously. The facts are not in dispute. The Ford Motor Company (hereinafter referred to as the “ company ”) is a Delaware corporation engaged in the business of manufacturing and selling automobiles, trucks and replacement parts. The company’s executive offices and principal plants are located in the State of Michigan. In the operation of its business the company maintains a number of offices, factories, foundries, forges, mills and assembly plants at various places in different States of the United States and abroad. Although many of its plants and offices are spread over a large geographical area, internally the numerous and various operational units are organized to function in seven groups denominated as divisions, designated as “ operations ” on the company’s chart of organization. The divisions are responsible to the vice-president in charge of manufacturing, whose own staff is one of seven units comprising the company’s entire staff responsible to the *636 executive vice-president. Two divisions primarily assemble automobiles. One division is a depot for parts and accessories for automobiles. Another division is devoted to the company’s business in foreign countries. The remaining three divisions fabricate, manufacture, supply and ship to the company’s assembly plants manufactured parts and fabricated materials essential to the production of its automobiles and trucks. Each division is in charge of a general manager. The two assembly divisions each have their own staffs and plants. The Lincoln-Mercury division consists of a staff and four plants, none of which is located in New York State. The company assembly operations division, in addition to its staff, consists of fifteen plants located in a number of States. In the State of New York one of these plants is located at Buffalo and is designated as the Buffalo assembly plant. This is the plant in which the claimants, Machcinski, et al., were employed. Another plant is located at Green Island at which the company manufactures radiators and springs for Ford cars. It make approximately 2,800 radiators and 3,500 springs per day. These parts are sent to seventeen assembly plants and ten parts depots. The number of radiators and springs to be manufactured at Green Island depends upon the production schedules received from the office of the vice-president in charge of manufacturing in Michigan. This is the plant at which the claimant, Muir, was employed.
These are test cases, the decision of which, pursuant to stipulations, will determine the rights of approximately 1,200 employees at the Buffalo plant and of approximately 375 employees at the Green Island plant. The company’s employees in the River Rouge plants, and more particularly in the Dearborn assembly plant, where the controversy arose, are members of a local union, affiliated with the same international union to which the employees of the Buffalo and Green Island plants belong. All of the company’s maintenance and production workers in all of its operations generally work under a master contract between the company and this international union. Provision is made for handling local issues between the company and its employees initially on a local basis by the local union and plant manager. If grievances are not settled after passing through two stages at the local level in the grievance procedure, the local union may appeal to the international union for assistance. If the international union is unsuccessful in reaching an agreement in the matter at issue, *637 the dispute is returned to the members of the local union to decide whether or not strike action should be taken.. If the membership of the local union votes for a strike, the results of the vote are certified to the international anion for its approval before the strike may officially be called by the local union. The company’s employees in the Dearborn plant, early in 1949, became dissatisfied with the standards of production which the company had the right to establish for all its assembly plants. The local union having jurisdiction in the River Rouge plant is Local 600, 4,000 of whose members were employed in what is known as the “ B ” building. It formally took the necessary steps under the established grievance procedures. The grievance not being settled at the local level, the services of the international union were enlisted. When the international union failed in its attempt to adjust the grievance in a satisfactory manner, the membership of Local 600 voted in favor of a strike. This action was approved by the international union. On May 5, 1949, Local 600 consisting of 65,000 men at the River Rouge plants struck, thereby causing a complete stoppage of work there. Pickets were at the gates of the River Rouge plants. No general strike was authorized and none occurred. The strike was settled on May 29, 1949. The employees of the Buffalo and Green Island plants took no part in the strike. The agreement, pursuant to which the employees returned to work in Michigan, was neither submitted to nor concurred in by the membership of the union at the Buffalo or Green Island plants. The claimants and their fellow employees at the Buffalo and Green Island plants were at all times between May 5 and May 28, 1949, the period of the strike, ready and willing to continue to work at the plants.
When the claimants in these cases filed their claims for unemployment insurance benefits in May, 1949, the Industrial Commissioner issued initial determinations suspending their rights to benefits for a period of seven consecutive weeks or until the industrial controversy was settled, whichever occurred first, pursuant to subdivision 1 of section 592 of the Unemployment Insurance Law (Labor Law, art. 18). Claimants requested hearings before referees'and in each ease a decision was rendered sustaining the initial determinations of the commissioner. Claimants then requested a hearing before an appeal board, which consolidated all the cases and rendered one decision involving the claim of Machcinski. The other two claimants, as well as all other claimants at the Buffalo factory, similarly *638 situated, stipulated to be bound by the decision of the board in the Machcinski case. The referee in the Muir case likewise sustained the decision of the Industrial Commissioner and he also requested a hearing before the appeal board. The appeal board reversed all the decisions and held that the suspension provision did not apply since the River Rouge plants and the Buffalo and Green Island plants did not constitute one “ establishment ” as that term is used in the statute.
The following provision of the Unemployment Insurance Law is applicable to these appeals:
“ § 592. Suspension of accumulation of benefit rights.
“ 1. Industrial controversy. The accumulation of benefit rights by a claimant shall be suspended during a period of seven consecutive weeks beginning with the day after he lost his employment because of a strike, lockout, or other industrial controversy in the establishment in which he was employed, except that benefit rights may be accumulated before the expiration of such seven weeks beginning with the day after such strike, lockout, or other industrial controversy was terminated. ’ ’
The sole issue involved in these cases is whether the assembly plants of the Ford Motor Company located at Buffalo and Green Island, New York, are a part of the same “ establishment ” as used in the section of the statute above quoted, as the plants of this employer located in the River Rouge, Michigan area, at which a strike concededly took place in May, 1949, causing a shutdown of the Buffalo and Green Island plants.
Under subdivision 1 of section 592 of the Unemployment Insurance Law, two elements are necessary before the suspension provision may be invoked :
(1) The claimant must have lost his employment “ because of a strike, lockout or other industrial controversy,” and
(2) Such strike, lockout or other industrial controversy must have occurred “ in the establishment in which he was employed.”
There is no issue in these cases with respect to requirement (1). The only question, therefore, to be determined by this court is with respect to requirement (2), viz., whether the Buffalo and Green Island plants and the River Rouge plants are part of the same establishment.
The progenitor of unemployment insurance statutes in English-speaking. countries is the British Unemployment Insurance Act (1 & 2 Geo. V, ch. 55 [1911]). This statute was passed *639 twenty-four years prior to the enactment of the New York Unemployment Insurance Law (L. 1935, ch. 468). The suspension provision in the British statute relating to work stoppages is quite different from our own. That statute provides that where separate branches of work which are commonly carried on as separate businesses in separate premises are in any case carried on in separate departments on the same premises, each of those departments shall be deemed a separate factory or work shop, as the case may be. Unlike the British statute, our statute never has used the words, ‘ ‘ factory, workshop or other premises ”, but merely uses the word, “ establishment ”. The British statute also contains escape provisions to the effect that the suspension shall not apply if the claimant is not participating in or financing or directly interested in the trade dispute which caused the work stoppage, and does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage is taking place, any of whom are participating in or financing or directly interested in the dispute. Our statute contains no such provisions.
Most of the sister States enacted unemployment insurance statutes shortly after 1935. They were encouraged and assisted by the Federal Government in the preparation and enactment of these laws. As a guide in their preparation, the Federal Social Security Board in 1936, prepared for the use of the various states a “ draft bill ” modeled generally after the British statute. Many of the States incorporated this provision in their statutes almost verbatim. We never adopted that statute. Under our law there is no requirement of participation, financial aid or interest, nor is there any provision which deems separate branches of work as separate factories, workshops or premises.
Unemployment compensation statutes were enacted in various States during a period of distress and were designed to relieve the hardship caused by unemployment due to no fault of the employee. The legislative purpose behind the enactment of our act is to be found in the legislative declaration of public policy in section 501. There, the Legislature stated that in its considered judgment the public good and the well-being of the wage earners of this State require the enactment of this measure for the compulsory setting aside of financial reserves for the benefit of persons unemployed through no fault of their own. This is a remedial statute, a humanitarian statute, and should be construed accordingly. It is the general *640 rule that a liberal construction is accorded statutes which are regarded by courts as humanitarian or which are grounded on a humane public policy. In the two cases that we are considering the unemployment was involuntary. These employees had nothing to do with the stoppage of work in the Detroit plant. They were not consulted about the work stoppage or with the prosecution of the strike and clearly they had nothing to do with the settlement. They are the innocent victims of a situation wholly beyond their control. The question which we have to decide is whether these claimants lost their employment because of a strike' in the establishment in which they were employed within the meaning of subdivision 1 of section 592 of the Unemployment Insurance Law.
Claimants contend that the word, “ establishment ” should be construed to apply only to the plant in which they were engaged in the particular assembly operation and that consequently they did not lose their employment because óf a strike in the establishment in which they were employed. Appellants contend that the employer’s organization for the production of motor vehicles is the “ establishment ” within the meaning of the statute and, therefore, claimants did lose their employment because of the strike in the establishment in which they were employed.
The pioneer court decision in this country on the question before us is Spielmann v. Industrial Comm. (236 Wis. 240). In that case tbe employer, Nash-Kelvinator Corporation, manufactured Nash automobiles. Its body plant was at Milwaukee, Wisconsin, and it had an assembly plant at Kenosha, Wisconsin, forty miles distant. The operations were highly synchronized and centrally controlled. A strike was called at the Kenosha plant, which forced the closing of the Milwaukee plant. The Supreme Court of Wisconsin held that the employees of the Milwaukee plant were subject to the suspension because the strike was in the “establishment” in which they were employed. The provision of the Wisconsin Uemployment Reserves and Compensation Act, reads as follows: ‘ ‘ An employee who has left (or partially or totally lost) his émployment with an employer because of a strike or other bona fide labor dispute shall not be eligible for benefits from such (or any previous) employer’s account for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed.” (Wis. Stat. [1949], § 108.04, subd. [10].)
*641 In 1941, a case, similar to the Spielmann case, arose in the State of Michigan (Chrysler Corp. v. Smith, 297 Mich. 438).
That "case also involved an automobile manufacturer whose plants were closely integrated and dependent one upon the other. There were nine co-ordinated plants in the Detroit area. The strike took place in one of the key plants which supplied parts to the other plants. The strike caused a closing down of the plants to which the parts were supplied. The Michigan unemployment insurance statute contained a provision which required that the dispute be in the ‘ ‘ establishment ’7 in which the claimant was employed. The Supreme Court of Michigan held that all the employees of all the plants were ineligible for benefits because such plants constituted one establishment. In its decision the court also quoted from the Spielmann case (supra). These are the two cases upon which the appellants rely for reversal.
The Alabama Unemployment Compensation Law contains a provision disqualifying claimants for benefits “for any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed ”. (Ala. Code, tit. 26, § 214, subd. A.)
In Tennessee Coal, Iron & R. Co. v. Martin (33 Ala. App. 502. affd. 251 Ala. 153) the courts were called upon to apply this statute. In an opinion by the Alabama Court of Appeals, which was approved by the Alabama Supreme Court, recognition was afforded the validity of the tests of “unity of management and integrality of function.” In applying those tests to that case, it was found that employees in coal mines were not employees of a single establishment comprising the employer’s railroads, steel mills or mines and coal mines, even though there was some degree of integration. The Court of Appeals distinguished the Spielmann and Chrysler cases (supra) on the ground that the “ degree of coordination or integration ” in those cases was “ vastly different from the integration and coordination present in the instant case.” (P. 508.) It was there pointed out that the integration was between entirely different kinds of manufacturing enterprises, which were commonly conducted as separate businesses, and that “ there is a significant difference of degree between an assembly line integration of finished products, such as was present in the Spielmann case, supra, and an integration of entirely different types of raw material production and processing plants as exist in this case.” (P. 508.)
*642 The Minnesota Employment and Security Law contains disqualification clauses relating to labor disputes in the “ establishment ”. (Minn. Stat., § 268.09, subd. 1, par. [6].) Cases involving Ford Motor Company employees employed at plants in that State, who became unemployed as the result of the strike at the River Rouge plants, have been held not to be subject to the disqualification provision (Nordling v. Ford Motor Co., 42 N. W. 2d 576 [Minn.]). The opinion in that case states that the word “ establishment ” was never meant or intended to mean an entire organization but a separate unit. In discussing the Spielmcmn and Chrysler cases (supra) the Minnesota court had this to say (pp. 586, 587):
“ Rather -than distinguish the cases on differing facts, we prefer to place decision on the broader ground that we believe that the test of functional integrality, general unity, and physical proximity should not be adopted as an absolute test in all cases of this type. No doubt, these factors are elements that should be taken into consideration in determining the ultimate question of whether a factory, plant, or unit of a larger industry is a separate establishment within the meaning of our employment and security law. ’ ’
“ * * * We believe the better rule to be that these factors, together with other facts, must be taken into consideration in determining whether the unit under consideration is in fact a separate establishment from the standpoint of employment.”
The Superior Court of New Jersey, Appellate Division, in Ford Motor Co. v. New Jersey Dept, of Labor & Industry (7 N. J. Super. 30, subsequently affd. by the Supreme Court of New Jersey, 5 N. J. 494) rendered a decision construing and applying the disqualification provision contained in the New Jersey Unemployment Compensation Law which uses the words “ factory, establishment or other premises at which he is or was last employed ”. (N. J. Rev. Stat., § 43:21-5[d].) One of the claimants there was an employee of Ford Motor Company at its assembly plant at Edgewater, New Jersey, and the other was an employee of that company at its assembly plant at Metuchen, New Jersey. They were laid off because of lack of materials as a result of the May, 1949, strike at the Ford plants in Michigan, the same strike which is involved in these proceedings. These employees filed for benefits and the question presented was whether they had been employed at the “ factory, establishment or other premises ” at which the stoppage of work occurred. The New Jersey courts appar *643 ently refused to follow the Spielmann and Chrysler cases (supra).
In Tucker v. Atlantic Smelting & Refining Co. (189 Md. 250) a strike in the employer’s Utah smelter had resulted in a shutdown of a refinery owned and operated by the same employer in Maryland. The Maryland Court of Appeals, upholding the Maryland claimants’ right to unemployment benefits, reviewed the facts of the Spielmann case and held it not applicable, primarily because of the lack of physical proximity such as there had been in the Wisconsin situation. In like manner, the Chrysler decision was also rejected. The Maryland Court said (p. 256): “ It would be futile.to attempt to fix a precise limit (whether 2000 miles, or more or less) of ‘ physical proximity ’. It is sufficient that in the ordinary use of words, a plant at Garfield [Utah] and one at Baltimore would not be called one ‘ establishment ’ ”.
Holdings similar to the Tucker decision are to be found in Walgreen Co. v. Murphy (386 Ill. 32). In that case the Illinois Supreme Court said (p. 39): “ The words ‘ establishment ’ and ‘ premises ’ * * * are so commonly understood as units of place that further definition is superfluous. * * * Complete geographic isolation * * * is sufficient to justify classification of the warehouse as an establishment.”
In Phillips, Inc. v. Walling (324 U. S. 490, 496) the United States Supreme Court in interpreting the phrase “ in the establishment ” as found in the Fair Labor Standards Act, held that it was used in that act as “ normally used in business and in government — as meaning a distinct physical place of business. ’ ’
The question involved here has never been passed upon by the courts of this State. We have examined all the decisions on the subject called to our attention by the attorneys for the respective parties. The authorities in other jurisdictions are helpful to us in arriving at a proper decision only to the extent that they are well reasoned and the grounds upon which they are presented appear to us to be sound. After all, however, we must construe our own law and apply the facts as shown by the record to the laws thus construed.
In our opinion we believe the word “ establishment ” as used in the statute means the place where the employee was last employed. Obviously, the Legislature never intended by the use of the word “ establishment ” to include all the plants of the Ford Motor Company, situate as they are in so many *644 States of the union and in foreign countries. To adopt the appellant’s contention would require us to hold that a few employees in any of the employer’s plants, in any part of this country, can prevent the workers in the Buffalo and Green Island plants from earning a livelihood or, in lieu thereof, from getting the insignificant amount of unemployment insurance that is available to them under the statute.
We are convinced that the solution of the problem before us is to be found in determining from all the facts available whether the Buffalo and Green Island plants under consideration are separate establishments from the standpoint of employment and not whether they are to be regarded as separate enterprises from the standpoint of management or for the more efficient production of manufactured products. In construing the statute before us we approach the subject from the standpoint of employment rather than management and in so doing we have no hesitancy in concluding that the findings of the unemployment board are amply sustained by the evidence
In our opinion we think the Unemployment Insurance Appeal Board properly rejected the contention of the appellants. The conclusion which the board reached is a just and an equitable one. It is our solemn duty to give this statute a liberal and an humanitarian interpretation.
The decisions appealed from should be hereby affirmed, with costs to respondents.
Foster, P. J., Brewster, Beto and Coon, JJ., concur.
Decisions appealed from affirmed, with a separate bill of costs to respondents in each case against appellants.