LIBERTY TRUCKING COMPANY, Appellant, V. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents. [Case No. 258.]

NEUENDORF TRANSPORTATION COMPANY, INC., Appellant, V. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents. [Case No. 259.]

CHIPPEWA MOTOR FREIGHT, INC., Appellant, V. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents. [Case No. 260.]

*Nos. 258–260. Argued January 2, 1973.—Decided February 27, 1973.*
(Also reported in 204 N. W. 2d 457.)

For the appellants there was a brief by *Michael, Best & Friedrich,* attorneys, and *Lee J. Geronime, Jacob L. Bernheim,* and *Thomas E. Obenberger* of counsel, all of Milwaukee, and oral argument by *Mr. Geronime* and *Mr. Bernheim.*

For the respondents there was a brief by *Uclair W. Brandt,* Department of Industry, Labor & Human Relations chief counsel, attorney, and *Arnold J. Spencer* of counsel, of Madison, and *Goldberg, Previant & Uelmen* and *David Loeffler* of counsel, all of Milwaukee, and oral argument for respondent Department of Industry, Labor & Human Relations by *David A. Pearson,* assistant chief counsel.

HALLOWS, C. J. Each case concerns the question of whether the trucking company's workers employed in

its Wisconsin terminals are eligible for unemployment compensation as a result of their unemployment during a strike-lockout occurring at the employer's Chicago terminal. The single issue presented is whether the trucking system, including the terminal constitutes the "establishment" in which the employees were employed within the meaning of sec. 108.04 (10), Stats.

Employees, by sec. 108.02 (18), Stats.,[1] are presumed to be eligible for unemployment benefits, but sec. 108.04 (10)[2] makes ineligible an employee who partially or totally loses his employment because of a strike or other bona fide labor dispute in active progress in the "establishment" in which he is employed.

Certain facts are basic to the three cases. Each appellant is a multiterminal common carrier having its principal terminal in Chicago, Illinois, and other terminals in Wisconsin. Each is engaged in the transportation of property in interstate commerce by motor vehicle for compensation. Each is within the coverage of the Interstate Commerce Act (49 USCA, sec. 301, *et seq.*) and is subject to regulation by the interstate commerce commission (49 USCA, sec. 302 (a)). Each operates under a certificate of public convenience and necessity and its operations are limited to specified routes and between

---

[1] "108.02 **Definitions.** As used in this chapter: . . .

"(18) ELIGIBILITY. An employe shall be deemed 'eligible' for benefits for any given week of his unemployment unless he is disqualified by a specific provision of this chapter from receiving benefits for such week of unemployment, and shall be deemed 'ineligible' for any week to which such a disqualification applies."

[2] "108.04 **Eligibility for benefits.** . . .

"(10) LABOR DISPUTE. An employe who has left (or partially or totally lost) his employment with an employing unit because of a strike or other bona fide labor dispute shall not be eligible for benefits from such (or any previous) employer's account for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed."

fixed terminals. In addition, Neuendorf, which also operates intrastate, is regulated by the Wisconsin public service commission, pursuant to ch. 194, Stats. The predominant proportion of the business conducted at the Wisconsin terminals is directly related to the transportation of freight in and out of the respective Chicago terminals.

The three appellants, with other trucking companies, are members of Trucking Employers, Inc. (TEI) and had given it authority to negotiate basic national labor contracts with the International Brotherhood of Teamsters (IBT), which negotiated on behalf of the trucking industry employees who were members of various local unions affiliated with IBT. The appellants also were members of the Central Motors Freight Association (CMFA), which carried on negotiations in Illinois with various local unions for local agreements to supplement the national contract.

In January of 1970, TEI and IBT started negotiations to replace the contract which was due to expire on March 31, 1970. While a national contract was reached on April 2 or 3, 1970, its ratification was delayed by the locals pending various negotiations. At this time, intermittent strikes occurred in Chicago, but the employees of the appellants did not strike in Wisconsin. On April 10, 1970, the appellants with other trucking companies locked out all their employees in Chicago because of the local selective strikes at various terminals in Chicago by Local Union 705. This lockout existed through July 6, 1970, when a local Chicago agreement was reached.

During the lockout, no freight moved in or out of the Chicago terminals to the Wisconsin terminals. None of the appellants' Wisconsin terminals was the object of the strike or of picketing. Operations at all the Wisconsin terminals continued; but as a result of the Chicago lockout, a substantial number of employees at the Wisconsin

terminals became unemployed because freight shipments could not go to and from the Chicago terminals.

The Wisconsin employees who lost their employment because of the labor dispute at the Chicago terminals filed claims for unemployment benefits. The appellants objected on the ground their employees were ineligible for benefits under sec. 108.04 (10), Stats., because the strike-lockout in Chicago was in the "establishment" in which they were employed. The appeals tribunal and the department found the employees were eligible for unemployment compensation because although there was a strike or lockout which caused their unemployment, the Chicago terminals were not the "establishment" or a part thereof in which the employees were employed. The circuit court affirmed the findings and conclusion.

There is no question the lockout and strike at the Chicago terminals constituted a bona fide labor dispute. *See A. J. Sweet, Inc. v. Industrial Comm.* (1962), 16 Wis. 2d 98, 114 N. W. 2d 141, rehearing denied, 114 N. W. 2d 853. Both parties rely on *Spielmann v. Industrial Comm.* (1940), 236 Wis. 240, 295 N. W. 1, and *Schaeffer v. Industrial Comm.* (1960), 11 Wis. 2d 358, 105 N. W. 2d 762, for their respective conclusions. The appellants argue their "entire transportation *system,* as delineated and defined by terminal points and connecting routes, constitutes, as a matter of law, the 'establishment' within the meaning of sec. 108.04 (10), Stats."

Regardless of how other states [3] have construed the word "establishment" in their unemployment act, Wis-

---

[3] *General Motors Corp. v. Mulquin* (1947), 134 Conn. 118, 55 Atl. 2d 732; *Walgreen Co. v. Murphy* (1944), 386 Ill. 32, 53 N. E. 2d 390; *Ford Motor Co. v. Director of the Division of Employment Security* (1951), 326 Mass. 757, 96 N. E. 2d 859; *McAnallen v. Employment Security Comm.* (1970), 26 Mich. App. 621, 182 N. W. 2d 753; *Northwest Airline v. Employment Security Comm.* (1966), 378 Mich. 119, 142 N. W. 2d 649; *Park v. Employment Security Comm.* (1959), 355 Mich. 103, 94 N. W. 2d 407; *Nordling*

consin has adopted three factors which it considers important in determining when separate plants, factories, or other facilities of the same employer constitute one "establishment." These factors, which were first used by the department are functional integrality, general unity, and physical proximity. *See Spielmann v. Industrial Comm., supra.* The element of general unity involves a consideration of both unity of employment and unity of management, with the former deserving more weight than the latter. *Schaeffer v. Industrial Comm., supra.*[4] Several attempts have been made to formalize the element of physical distance into a mathematical certitude, but as yet no such measuring stick has been adopted.[5] Functional integrality is an element which was most prominent in *Spielmann* and the concept includes not only the interdependence of the separate plants or the facilities but also a meshing or synchronizing of the work so their separateness of location is minimized. The factor of functional integrality means more than dependence. Generally, in varying degrees, all plants of one employer related to a product are interdependent. It is the degree of normal dependency and the synchroni-

*v. Ford Motor Co.* (1950), 231 Minn. 68, 42 N. W. 2d 576. In the above-cited Michigan cases, the distinction is made between flight personnel and ground personnel; and considering the factor of a distinct physical place of beginning necessarily localized in character as being of prime importance, the court found two separate establishments to accommodate the character and place of each group's employment. *See also* cases discussed in Annot. (1953), 28 A. L. R. 2d 287.

[4] In *Schaeffer*, this author wrote a dissent, arguing unity of management should be given more consideration or weight in the formula but not equating establishment with management.

[5] In 1951 the legislature refused to limit the term "establishment" to work places 10 miles or less apart by defeating Bill No. 273,A. In 1959, 1963, and 1965, unsuccessful attempts were made by identical bills to limit the term "establishment" to "the premises where" the worker "is or was employed." Bill No. 145,A (1959), Bill No. 390,A (1963), and Bill No. 214,A (1965).

zation of the relationship in the manufacturing of the product or the rendering of the service and the relationship of the place or locale of the strike to the place or area of employment which must be considered under the element of functional integrality.

However, no element is controlling and it is clear the "establishment" in a multiplant company may be all the plants or only one plant. Likewise, in a single-plant company, it can mean only a single plant. The "establishment" does not mean the company or its business or a permanent commercial organization as such. The use of the phrase, "labor dispute is in active progress in the establishment in which he is or was employed," refers to something tangible and to something other than an organization and connotes a general work area which in most cases would be a physical facility, such as a building or a plant constituting a complex of several buildings. A labor dispute in common usage is generally referable to a work area and the picketing is focused on such an area or facility.

In *Spielmann*, this court found the "establishment" to include an auto body manufacturing plant in Milwaukee and the assembly plant 40 miles away in Kenosha. The factor emphasized there was the functional integrality, although both general unity and physical proximity were found. In *Spielmann*, the manufacturing of the product, *i.e.*, autos, was so highly specialized and integrated that the production lines in both locations were synchronized to the degree they might have been alongside of each other in the same building. In *Schaeffer*, the court found separate plants approximately 80 miles apart not to be so functionally integrated as to constitute one "establishment." Although there was dependence of one plant upon the paper pulp manufactured by the other plant to the extent that up to 86 percent of the pulp produced was

used, there was not the synchronization which existed in *Spielmann*.

The present case is unlike *Spielmann* and *Schaeffer* because we are not dealing with a manufactured product, but a service, and consequently, "establishment" must be considered in this context. We think, however, the three factors are relevant to services although their application may vary. In considering functional integrality, we look at the effect of the strike to determine the integration. In the case of Liberty Trucking Company, at least 90 percent of the goods hauled to each of the three Wisconsin terminals came from Liberty's Chicago terminal and at least 90 percent of the traffic from each of the Wisconsin terminals at Beloit, Janesville, and Madison, went to the Chicago terminal. During the lockout, Liberty's business decreased to about 10 percent of normal. In the case of Neuendorf, 85 percent of its normal business involved freight to and from the Chicago terminal and its Wisconsin terminals. During the first two weeks after the lockout, only 13.5 percent of its normal business was transacted; but beginning with the fifth week after the lockout, the freight increased at the Wisconsin terminals to 30 to 35 percent of normal. In the case of Chippewa, 75 to 88 percent of its normal tonnage business moved between Chicago and its Wisconsin terminal at Eau Claire; the rest was tonnage moving between Eau Claire and St. Paul terminals. During the lockout period, Chippewa's business decreased to approximately 25 percent of normal. About 35 percent of all the employees employed at the Eau Claire terminal were not laid off. While these facts show dependence, they do not reach any degree of synchronization of service.

In considering the factor of general unity, all the terminals were owned and operated by the respective employers and were therefore a part of the permanent commercial organization and there was a unity of man-

agement of the terminals. In respect to unity of employment, the employees at the employers' terminals in Chicago were represented by Chicago Local Union 705 and 710 of IBT. But in Wisconsin, Chippewa had an agreement with Local 662 of IBT covering its single Wisconsin terminal at Eau Claire. Liberty had local agreements covering its three Wisconsin terminals. Neuendorf had agreements with various Wisconsin locals at its six Wisconsin terminals and in respect to its employees at the Wisconsin terminals, seniority, vacations, and working rules were governed by the local agreements. Obviously, the employees were not one unit although they all belonged to some union.

The facts relating to physical proximity are, of course, undisputed. Liberty's three Wisconsin terminals at Madison, Janesville, and Beloit, are from 88 to 144 miles from its Chicago terminal. Neuendorf's six Wisconsin terminals at Janesville, Madison, Stevens Point, Marshfield, Wausau and Medford are from 109 to 275 miles' distance from its Chicago terminal. Chippewa's single terminal in Wisconsin at Eau Claire is 330 miles from its Chicago terminal. Consequently, the distance between each employer's terminal in Chicago and Wisconsin exceeds the distance involved in both *Spielmann* (40 miles) and *Schaeffer* (80 miles); but, more importantly, the distances tend to break down the concept of a tangible oneness although from the employers' standpoint the distances are prescribed and mark only the beginning and the end of its service.

We cannot agree the appellants' trucking systems as a matter of law constitute the respective "establishment." The legal scope of business operation and the geographic limits of the transportation system do not necessarily relate to the concept of "establishment." There may be several "establishments" of an employer. The appellants' argument is the equivalent of saying that because

of the nature of the entire trucking business, each transportation system is the "establishment." Since distances are meaningful in the trucking industry as one of the bases of freight charges and terminals are necessary to the service, the appellants' argument carried to its logical conclusion could establish a nationwide "establishment," which would be the equivalent of holding "establishment" means the employer. We do not think the legislature had any such intention when it used the word "establishment" in sec. 108.04 (10), Stats.

While the nature of the product, *i.e.*, transportation, and the nature of the business may make terminals a part of the whole system, it still does not make the terminals one "establishment." And while the product is service, we do not find the synchronization of the movement of freight between the terminals in these cases which is necessary to render the factor of functional integrality a dominant consideration. While we have a unity of management, the unity of employees is not great. While there is no hard-and-fast rule as to distance, the terminals are in no real sense approximately close. We cannot agree the findings of the department are not sustained by the evidence.

The appellants, in their argument that the nature of the trucking industry is different than manufacturing and the concept of "establishment" applied to the manufacturing industry is inappropriate to trucking, analogize the trucking industry to the communication industry. They cite *Mountain States Telephone & Telegraph Co. v. Sakrison* (1950), 71 Ariz. 219, 255 Pac. 2d 707, wherein the court held, after considering the nature of the telephone industry, that the statewide network of the telephone exchanges and offices constituted the "establishment." The appellants also rely by way of analogy on *American-Hawaiian Steamship Co. v. California Employment Comm.* (1944), 24 Cal. 2d 716, 151 Pac. 2d 213,

wherein the court defined "establishment" as a broad area of employment which encompassed the docks of all steamship companies along the San Francisco waterfront even though not owned by the employer. The *Mountain States Case* was decided on the "business-entity theory," which is not accepted by this court. The *American-Hawaiian Case* correctly found "establishment" to include the place where the employees customarily worked although the docks were not owned by the employers or their place of business, but no question of multiterminals was involved.

The appellants argue they are entitled to reversal because the circuit court applied inconsistent rationales in its consideration of the relationship of normal business conditions and abnormal business conditions to functional integrality; we think not. The rationales we need not discuss. An appellate court is concerned with whether the decision of the department is correct, not whether it or the circuit court's reasoning is. If the holding is correct, it should be sustained and this court may do so on a theory or on reasoning not presented to the lower court. 5 Am. Jur. 2d, *Appeal and Error*, p. 170, sec. 727, *et seq.* The case before us on appeal stands in the same posture it did before the circuit court on review.

The appellants argue some of the findings of fact by the department require reversal, and if these findings are reversed, then when added to the other findings, the evidence is so strong that only one reasonable interpretation of the facts can be drawn as a matter of law. While normally an issue of fact can cease to be so because of the nature of the evidence, we do not find this argument helps the appellants. We find no error in the findings that, with respect to Liberty, after the Chicago terminals closed Liberty continued to conduct trucking operations at its Wisconsin terminals on a reduced scale, when the record established the operation never exceeded 10 per-

cent. A similar criticism is made that the operations with other truckers were carried on at Rockford on a lesser scale. Further criticism is made of other findings although they were technically correct. Findings need not be as specific as the appellants contend and findings are not erroneous because they are stated in terms of ultimate facts rather than in terms of evidentiary facts. In none of these cases have the appellants shown the findings are not supported by credible evidence.

With respect to Chippewa, it is claimed its drivers refused to take loads out of Chicago terminals on the night before the lockout. Chippewa knew it was going to lock out its employees early Friday morning and sent a load of freight to Chicago on Thursday. This was allowed to proceed through the picket line at the Chicago terminal, but the employees refused to pass the picket line with a return load of freight. The record is silent on the identity of the employees who refused to cross the picket line and since eligibility for unemployment compensation is presumed, Chippewa has not met its burden of proof in showing ineligibility of any particular employee.

*By the Court.*—Judgments affirmed.