SECURITY SAVINGS & LOAN ASSOCIATION, Appellant, v. WAUWATOSA COLONY, INC. and another, Respondents.*

No. 596 (1974). Argued November 24, 1975.—Decided February 3, 1976.
(Also reported in 237 N. W. 2d 729.)

* Motion for rehearing denied, with costs, on April 7, 1976.

For the appellant there were briefs by *Schoendorf & Schoendorf* of Milwaukee, and oral argument by *Joseph F. Schoendorf*.

For the respondent there was a brief by *Charles L. Goldberg* and *Francis X. Krembs* of Milwaukee, and oral argument by *Francis X. Krembs*.

CONNOR T. HANSEN, J. For the purposes of this appeal, the plaintiff will be identified as "Security" and the defendants as "Callan."

On July 31, 1962, Callan executed a mortgage note with Sherman Savings and Loan, the predecessor of plaintiff-Security Savings, in the amount of $114,000. Callan is engaged in the real estate business. He had entered into a number of similar business transactions with Sherman Savings, but has done no business with Security, with the apparent exception of matters relating to obligations outstanding at the time Security took over Sherman Savings.

The mortgage note contains the following clause in paragraph one:

". . . The rate of interest stipulated herein may be increased at the option of the Association; provided, however, that the Association may not exercise such right in less than 3 years from the date of the loan, and then only upon at least four months' written notice to the borrower; and provided that in the event of such an increase in the stipulated rate of interest the borrower may prepay the loan within such notice period without penalty."

Pursuant to that clause, Security increased the rate of interest on the mortgage note from 5½ percent to 7½ percent on June 28, 1968, and from 7½ percent to 8½ percent on May 28, 1970.

On February 10, 1971, Callan's mortgage account passbook showed a remaining balance of $40,605.55. On February 19, 1971, Security Savings advanced $1,604.91 to defendant for payment of real estate taxes. By check dated February 24, 1971, Callan attempted to pay the balance owing by presentation to Security of a check bearing the notation "mortgage principal balance in full," in the amount $40,605.55.

Security returned the check because allegedly insufficient to constitute payment in full of the principal indebtedness which included additional interest and moneys

advanced for tax payments. The partial payment of real estate taxes advanced by Security had been added to the principal indebtedness as provided in the mortgage contract.

On March 12, 1971, Callan paid Security the amount of the tax advance. On May 26, 1971, the original check was again presented to Security and again rejected for the same reasons previously given.

The particular determinations of the trial court which are pertinent to this appeal are: (1) Security could not increase the interest rate more than once during the mortgage term, and (2) the facts relating to the presentation of the check by Callan were such that it constitutes prepayment of the loan.

Specifically, we perceive the two issues presented for determination by this court to be:

1. Was the plaintiff prohibited by the terms of the mortgage note from increasing the interest thereon more than once?

2. Was the accrual of interest on the balance due on the mortgage note terminated by defendant's presentation to plaintiff on February 26, 1971, of a check in the amount of $40,605.55?

*Interest escalator clause.*

Callan argues that the increase in interest rate which took place on November 1, 1968, exhausted Security's right to invoke the escalator clause. The trial court found, as contended by Callan, that the plain meaning of the escalator clause denoted contemplation of a single-time use, and that had the possibility of multiple uses been intended, it would have been easy to use terminology indicating such intent.

Security contends that this determination was erroneous because the terms of the disputed clause must be

construed in connection with the statutory section governing escalator clauses in mortgages held by savings and loan associations. Section 215.21 (3) (b), Stats., provides:

"(b) The mortgage or mortgage note may provide that the interest rate may be increased after 3 years from the date thereof, by giving to the borrower at least 4 months' notice of such intention. The borrower may, after receipt of such notice, repay his loan within the time specified in such notice without the payment of any penalty."

The composition and powers of savings and loan associations are governed by the provisions of ch. 215, sec. 215.01, *et seq.*, Stats. Because there is a specific provision within that chapter dealing with the power to escalate interest rates during the term of the mortgage, the construction of the statute is dispositive of the questions relating to the power of Security to invoke the escalator clause contained in the mortgage here in dispute. It is manifestly clear that by including the escalator clause in the mortgage contract, the parties were doing so pursuant to the statute.

This type of association existed at common law and possessed common-law rights. *De Fazio v. Haven Savings and Loan Association* (1956), 22 N. J. 511, 126 Atl. 2d 639. Therefore, it must be resolved whether the statute is subject to the strict construction applicable to statutes in derogation of common-law rights.

Generally, statutes restraining the freedom of contract have been considered subject to these rules. 82 C. J. S., *Statutes*, p. 942, sec. 393. However, comprehensive legislation dealing with these associations, having common-law rights, is regulatory, placing limits on those rights, rather than enabling, or conferring power or authority on the association. *Julien v. Model B., L. & I. Asso.* (1902), 116 Wis. 79, 89, 90, 92 N. W. 561. In this context, the rule of strict construction has its limits:

". . . An exception to the rule of strict construction is customarily made in the case of a statute which purports to provide a complete system of law covering all aspects of the subject with which it deals, so as to supersede all prior law on the subject, whether common or statutory law . . . .

". . .

". . . Modern regulatory legislation, moreover, is generally regarded as a newly conceived system of legal arrangements to deal with newly emergent problems in society, entitled to liberal construction because of its remedial character and not subject to the rule of strict construction of statutes in derogation of the common law because its genesis and conception are wholly outside and apart from any common law frame of reference . . . ." Sutherland, Statutory Construction (4th ed., 1974), *Statutes in Derogation of the Common Law: Limitations on the rule,* pp. 51, 52, sec. 61.03.

The law of this state is in accord with this proposition. *Heiden v. Milwaukee* (1937), 226 Wis. 92, 100, 101, 275 N. W. 922; and *Schumacher v. Milwaukee* (1932), 209 Wis. 43, 46, 243 N. W. 756. Therefore, normal rules of statutory construction are applicable to the instant provision.

*Amidzich v. Charter Oak Fire Ins. Co.* (1969), 44 Wis. 2d 45, 51, 170 N. W. 2d 813, stated:

". . . When a plain meaning of a word of a statute or contract is apparent, we need not resort to either construction or case law to bolster our recognition of that plain meaning . . . ."

Are the terms of the statute and mortgage so plain and clear as to preclude the necessity for construction?

In *Madison Metropolitan Sewerage Dist. v. DNR* (1974), 63 Wis. 2d 175, 179, 216 N. W. 2d 533, the following rule was restated:

". . . The test of ambiguity has been consistently stated: ' " 'A statute or portion thereof is ambiguous when it is capable of being understood by reasonably well-informed persons in either of two or more senses.' " ' "

We are of the opinion this statutory provision is ambiguous in that it is "capable of being understood by reasonably well-informed persons in either of two or more senses."

In *Ortman v. Jensen & Johnson, Inc.* (1975), 66 Wis. 2d 508, 520, 225 N. W. 2d 635, it was stated:

"This court has held that where a statute is ambiguous, this court must ascertain the legislative intention as disclosed by the language of the statute in relation to its scope, history, context, subject matter and the object intended to be remedied or accomplished. *Wisconsin Southern Gas Co. v. Public Service Comm.* (1973), 57 Wis. 2d 643, 205 N. W. 2d 403. The object to be accomplished by a statute must be given great weight in determining legislative intent. *Town of Menominee v. Skubitz* (1972), 53 Wis. 2d 430, 192 N. W. 2d 887. . . ."

The considerations mandated by *Ortman, supra,* necessitate review of the various policy arguments. The court in *Bruce v. Blalock* (1962), 241 S. C. 155, 163, 127 S. E. 2d 439, 443, in construing the terms of a contract setting utility rates, described the purpose of escalator clauses:

"The provision . . . is known in law as an 'escalator clause.' The Courts have recognized the necessity for such a clause because of the sharply inflationary and changing economic conditions prevailing in this country for the past several years. As a means of coping with such changing economic conditions, with resultant price variations, many contracts fix a base price but contain a provision whereby the seller may raise such price. The necessity for this type clause was brought about because of long term contracts when the parties thereto could not anticipate all price factors which might occur during the existence of the said contract. . . ."

The concerns there expressed are equally applicable to the necessity for interest adjustments in mortgage loans, and have been recognized as such. *See:* Comment, *The Variable Interest Rate Clause and Its Use in California Real Estate Transactions,* 19 U. C. L. A. Law Rev. 468

(1971–1972), which notes that "[w]hen the effects of the recent inflationary period adversely limited the supply of funds for residential homebuilding, savings and loan institutions attempted to use . . . , escalator clauses, in their lending agreements. . . ."

The validity of the clause itself is not in question. The issue is whether this particular statute, and the mortgage executed pursuant thereto, allow multiple increases during the term of the mortgage. We first observe there is no language in the statute which prohibits multiple escalations. The controlling words of both the statute and the note are "interest . . . may be increased." This language in no way limits the number of times the escalation clause may be used. The statute does establish the manner in which the use of the clause is to be exercised. It provides that three years must elapse from the date of the loan and then a four months' notice must be given to the borrower. The statute provides that the borrower may repay the loan within that time without the payment of any penalty.

A report from the commissioner of savings and loan associations to the governor in January, 1975, reflects the commissioner's interpretation of sec. 215.21 (3) (b), Stats. This report states that the statute imposes virtually no legal or contractual limits on the amount or *frequency* of escalations that borrowers might expect in the future. The commissioner then proceeds to make recommendation for legislative modification of the statute to impose additional restrictions.

The terms of real estate mortgage notes cover long periods of time, often twenty to thirty years. If the clause were limited in use to a single occasion, the association would necessarily be forced to make the single increase as large as possible, since it could not foresee what might happen in terms of economic conditions during the intervening years between the increase and the

end of the mortgage term. The terms of the clause prohibiting increase in less than three years following the date of the mortgage points to the conclusion that it was not contemplated that the association would elect to wait a substantial period of time, in comparison to the length of the mortgage, before invoking the clause. In other words, the relatively short time limitation does not support the argument that a single-use interpretation is reasonable even if it forces an association into waiting fifteen to twenty years into the term of the note to assess economic pressures and invoke the clause at that point in time. The association would, of necessity, if limited to a single increase, make that increase as large as possible. Besides being more onerous on the borrower, this would preclude realistic appraisal of economic conditions at any one point in time, and of their effects on the institution, its members, and the particular borrower himself. With institutions subject to such extensive regulations as savings and loan associations, it is not sufficient to say that the then current money market would adequately control these situations. Moreover, other terms in the statute operate to place a maximum beyond which rates cannot be raised.

Sec. 215.09 (12): ". . . The board of directors shall fix and determine the interest rate to be charged on all loans, *provided such rates of interest conform to the general range of interest rates approved by the commissioner,* but such rates of interest may not exceed the rates permitted by ch. 422 [consumer credit transaction] where applicable." (Emphasis added.)

Sec. 215.13: "Savings and loan associations may:
". . .
"(30) . . . Assess and collect from members interest, premiums, fines, fees, and other charges. No savings and loan association shall demand or receive for loans or discounts a rate of interest exceeding that allowed by law."

These statutory provisions, to some extent, serve to limit interest increases.

Therefore, having reference to the scope of the statute, the policy behind the clause, the ability of savings and loan associations to effectively manage the funds of its members and at the same time provide funds for borrowers, we conclude that the appropriate construction of the statute and, therefore, of the mortgage clause here in dispute, is one that allows multiple increases based on assessment of economic needs at on-going intervals. Whether further restrictions on the conditions imposed by sec. 215.21 (3) (b), Stats., are desirable is a matter for legislative consideration.

### Accrual of interest.

Callan argues that accrual of interest on the mortgage loan should have terminated at the time he proffered a check in the amount of $40,605.55 to Security. The following facts are pertinent with respect to this issue. The last entry in Callan's mortgage account passbook was dated February 10, 1971, and showed a balance owing of $40,605.55. On February 17, 1971, Security advanced the sum of $1,604.91 in behalf of defendant for payment of real estate taxes, since money deposited in an escrow account for tax payment purposes was insufficient in that amount. The amount so advanced was added to the principal indebtedness as provided in the mortgage contract. Thus, the balance due on the principal on February 19, 1971, was $42,210.46. On February 26, 1971, Callan presented a check, dated February 24th, to Security, in the amount of $40,605.55, with the notation "mortgage principal balance in full." It was not accepted. On March 12, 1971, Callan reimbursed Security for the tax advance. Also, on that date, Security returned the February 26th check to Callan. On

May 26, 1971, Callan presented the same check to Security. The check, once again, was not accepted.

The trial court concluded that the prepayment penalty clause in the mortgage note was valid, and that the check presented on February 26th was not payment in full, since the amount of the penalty was not included therein. Therefore, accrual of interest did not stop on that date. No issue is raised on this appeal in regard to the decision of the trial court on the effect of the prepayment penalty clause. Therefore we do not consider the issue. Callan argues, nevertheless, that the accrual of interest should have stopped because the amount of the check was the amount shown in the passbook; moreover, Callan subsequently deposited the check with the court, upon institution of this action, in accordance with the provisions of sec. 895.171, Stats., and, therefore, "kept the tender good." It appears that no interest was paid subsequent to February 10, 1971.

Regardless of the effect of the decision of the trial court as to the prepayment penalty, there is no way the check Callan presented on February 24, 1971, can be construed to represent payment of the "mortgage principal balance in full." The check represented the passbook balance due on February 10, 1971. It did not take into account the accrual of interest after February 10, 1971, or the tax payment advanced and capitalized by Security. The check presented was insufficient and the principle that: ". . . a regular and lawful tender of the amount due on a mortgage debt stops the running of interest thereon. . . ." 55 Am. Jur. 2d p. 460, sec. 431, is not applicable. Accrual of interest on the amount of the mortgage debt represented by the check could have stopped if Callan had not written on the check "mortgage principal balance in full." The fact that Callan subsequently paid the check into court has no bearing on the determination of the trial court that the check was not payment in full

and that the accrual of interest, therefore, was not halted. There remains the matter of interest from February 10, 1971, to May 26, 1971, the date of the second presentation of the check to Security. Callan paid the amount of the taxes advanced on March 12, 1971, which is the same date the check in question was returned to him. No tender was made of accumulated interest from February 10, 1971. The mortgage contract also provides that after sixty days the delinquent interest is to be capitalized. By the time the same check was again presented and refused on May 26, 1971, the delinquent interest had been capitalized. The presentation of this check on February 26, 1971, still containing the statement on it that it was payment of "mortgage principal balance in full," in fact at no time represented payment of the amount due. *Haddow v. J. L. Owens Co.* (1920), 172 Wis. 391, 179 N. W. 508. The accrual of interest was not halted.

Our attention is directed to testimony of Callan and the predecessor of Security concerning past practices of mortgage payments. We agree with the trial court. This testimony is of no probative value in this case.

*By the Court.*—Judgment affirmed in part; reversed in part.

ROBERT W. HANSEN, J. *(concurring in part; dissenting in part).* The interest escalation section of the savings and loan chapter of the Wisconsin statutes provides as follows:

"The mortgage or mortgage note may provide that the interest rate may be increased after 3 years from the date thereof, by giving to the borrower at least 4 months' notice of such intention. The borrower may, after receipt of such notice, repay his loan within the time specified in such notice without the payment of any penalty."[1]

[1] Sec. 215.21 (3) (b), Stats.

Three Justices of this court (Mr. Justice Leo B. Hanley, Mr. Justice Connor T. Hansen and Mr. Justice Roland B. Day) write that this statute authorizes, subject to the time limits set forth in the section, multiple increases in the rate of interest by a savings and loan association. The writer agrees that it does.

Three Justices of this court (Mr. Chief Justice Horace W. Wilkie, Mr. Justice Bruce F. Beilfuss and Mr. Justice Nathan S. Heffernan) write that this statute grants a power to a savings and loan association which must be contractually exercised to be effective. The writer agrees that the increased interest clause may be included or omitted by the provisions of the mortgage and note as bargained for by the parties.

The interest escalation clause in the mortgage agreement between the parties in the case before us reads as follows:

"The rate of interest stipulated herein may be increased at the option of the Association; provided, however, that the Association may not exercise such right in less than three years from the date of the loan, and then only upon at least four months' written notice to the borrower; and provided that in the event of such an increase in the stipulated rate of interest the borrower may prepay the loan within such notice period without penalty."

As to time limits and conditions for exercise of the statutory option to escalate interest, the provisions of this clause in the mortgage contract are identical with the language of the statute.

Three Justices of this court (Wilkie, C. J., Beilfuss and Heffernan, JJ.) find this clause in this mortgage to be ambiguous and resolve the ambiguity by holding this savings and loan association was here entitled to only one escalation of interest. The writer disagrees. If this mortgage clause is ambiguous, so is the statute.

Having agreed with three Justices (HANLEY, CONNOR T. HANSEN and DAY, JJ.) that this statute authorizes more than one escalation of interest rate by a savings and loan association, the writer would hold that this clause in this mortgage likewise authorized more than a single increase in interest rate by this savings and loan association. With the same language used in both, the same construction is to be given to both.

However, under both the statute and the clause in the mortgage, the sole and limited right given to the savings and loan association to alter the agreement of the parties was to increase the interest rate. No other provisions in the mortgage agreement could be altered. In the case before us, in its first upward adjustment of interest rate and monthly payments for principal and interest, as set forth in its notice of June 28, 1968, the savings and loan association went beyond its limited authority under the statute and under the provisions of the mortgage agreement. That notice provided, in material part:

"As of November 1, 1968, the interest rate on your loan will be increased 2% per annum. Your payments for principal and interest will be adjusted to $917.00 per month thereby increasing your total monthly payment to $1243.50.
"We trust that you will understand the need for these changes."

Two changes were thus made in the mortgage agreement. The first was the increase of two percent per annum in the interest rate. The second was the increase in monthly payments. A single payment in the stipulated amount was to be paid by the borrower each month. From such fixed and determined monthly payment, it is clear that the savings and loan was to subtract one-twelfth of the annual interest due, applying the balance to reduction of the principal owed.

Such subtraction of interest due and application of the balance of the monthly payment to the principal owed is a clear and unambiguous provision in the contract of the parties. No question of construction arises as to its unmistakable meaning. In fact, the mortgage agreement further provides that, in case of the mortgagor's failure to pay taxes, make repairs, procure insurance or discharge liens, the savings and loan association may make the payments for such purposes ". . . and all sums so paid shall be added to the unpaid balance of the aforesaid note. . . ." In such event, as to all sums so paid and thus added, they ". . . become a part of the mortgage indebtedness, with interest thereon at seven and two-tenths per centum (7.2%) per annum. . . ." In the event such situation arises, there is no provision for any increase in the amount of the monthly payments to be made. The payments made are to be added to the principal due, and interest on such payments for taxes, repairs, insurance or liens is to be taken out of the monthly payment, with the balance of the monthly payment, after taking out the interest on the loan at five and one-half percent and interest at seven and two-tenths percent on such subsequent amounts paid out by the savings and loan association, to be applied to reduction of the principal owed. The amount paid by the borrower each month does not go up. The percentage of such monthly payment applied on the principal goes down.

When the savings and loan association here, in its 1968 notice, increased the amount of the monthly payments as well as increasing the interest rate, it did two things, not one. As to the interest escalation, it was exercising its option under the agreement and pursuant to the statute. As to the increase in the monthly payments due under the contract, it was proposing a new mortgage contract. Under the original agreement,

the escalated interest payments would have come out of the stipulated monthly payments, leaving a smaller balance to be applied on the principal. Under the proposed agreement, there was to be an increase in monthly payments as well as an increase in interest rate. Such option to increase such monthly payments was not reserved to the association under this mortgage contract. Such additional change in the contract is not provided for in the interest escalation statute. By accepting such proposal and making the higher monthly payments required by the 1968 notice, the borrower accepted the proposed new and altered mortgage contract.[2] With both parties accepting and performing under the new mortgage agreement, there is a change in status of the so-called "second" interest escalation, as demanded by the savings and loan association, in its notice of May 28, 1970, effective October 1, 1970. It becomes a first interest escalation under the new or modified mortgage agreement which became effective on November 1, 1968. As such, it falls within the prohibition of the mortgage agreement of the parties, left unchanged in the second or successor agreement, that the association ". . . may not exercise such right [of interest rate increase] in less than 3 years from the date of the loan. . . ." It also falls outside of the statute, sec. 215.21 (3) (b), which authorizes a first interest rate increase only ". . . after three years from the date thereof. . . ." In the case before us, there became effective on November 1, 1968,

[2] Such an agreement would be taken out of the statute of frauds by part performance. *See:* secs. 240.06 and 240.09, Stats. 1967. *See also: Bunbury v. Krauss* (1969), 41 Wis. 2d 522, 534, 164 N. W. 2d 473, stating: "As stated above, sec. 240.09, Stats., makes the statute of frauds inapplicable if there has been a part performance of the contract. In order to make the doctrine applicable, the acts of part performance must be those which the oral agreement requires and must be for the purpose of carrying out such agreement."

a new mortgage contract between these parties, made so not by the increase in interest rate but by the substantial change as to monthly payments to be made. No interest rate escalation could be effected as to such new mortgage agreement until three years from the effective date of the new agreement.

Therefore the writer would hold invalid the attempted escalation of interest rate, contained in the notice given by this savings and loan association on May 28, 1970. The writer would uphold the position of the appellant savings and loan association that both the statute and the agreements of the parties here permit multiple escalations of interest. But the writer would hold the so-called "second" escalation, to have become effective on October 1, 1970, as a first escalation under the new agreement of the parties, effective November 1, 1968. As such, it is, under the agreement and under the statute, invalid as having been attempted within three years of the date on which the new agreement became effective. The respondent borrower here is not required to pay the increase in interest rate demanded by the savings and loan in its notice of May 28, 1970. Thus the writer would affirm the judgment of the trial court so holding, but not on the grounds stated by the trial court and relied upon by respondent. Of such taking a different road but reaching the same destination, our court has said: "Where we find an order to be correct, we may affirm it notwithstanding that counsel supported it on an erroneous theory, or even disclaimed the view of the law which we hold to be right."[3]

Since an appellate court is concerned with whether the result reached in the trial court is correct, not with

---

[3] *Laffey v. Milwaukee* (1958), 4 Wis. 2d 111, 115, 89 N. W. 2d 801.

whether the trial court's reasoning is,[4] the writer joins three Justices (WILKIE, C. J., BEILFUSS and HEFFERNAN, JJ.) in affirming the judgment of the trial court.

HEFFERNAN, J. *(dissenting in part).* The appellant savings and loan association argues incorrectly that the issue in this case is whether sec. 215.21 (3) (b), Stats., permits multiple interest increases. It ignores the issue on which the trial judge correctly considered the litigation.

Unfortunately, the majority opinion of the court follows this false path of statutory construction, rather than confining itself to the controlling threshold question of the construction of the mortgage contract between the parties. The path taken is not the one which the facts and the law require that this court follow.

The construction of the statute (sec. 215.21 (3) (b)) was never in issue in the trial court. Only the provision of the mortgage and note was the subject of the parties' litigation or the trial court's judgment.

That this is true is demonstrated by the trial judge's opinion, in which he said that the "interest escalation clause" (not the statute) plainly permitted but a single increase in interest. Moreover, the trial judge never questioned the statutory power of the Association to include in the mortgage and note provision for multiple and successive increments of interest. He only questioned whether the Association had contractually exercised its statutory power to make multiple rate increases. He concluded that the power had not been exercised and said that the Association "could easily have included

[4] *Liberty Trucking Co. v. ILHR Department* (1973), 57 Wis. 2d 331, 342, 204 N. W. 2d 457, this court holding: "If the holding is correct, it should be sustained and this court may do so on a theory or on reasoning not presented to the lower court."

terminology providing for the escalation of interest more than one time."

This case has nothing to do with the interpretation of sec. 215.21 (3) (b), Stats. It is irrelevant to the threshold question before us, the only question considered by the trial judge—did the mortgage and mortgage note allow multiple increases in the rate of interest? Only if that question is answered affirmatively is the interpretation of the statute an issue. The question here is not what interest increases the statute would allow, but what increases the parties had bargained for.

The Association does not justify its alleged right to multiple increases of interest rates on the basis of the note and mortgage. Rather, it argues that the statute would permit such an increase; and, hence, even in the absence of a contractual provision exercising that right, the creditor was entitled to the multiple rate increases.

This reasoning is bizarre, for sec. 215.21 (3) (b), Stats., grants a power to a savings and loan association which must be *contractually* exercised to be effective. The statute provides:

"(3) Mortgage and Mortgage Note. (a) Every mortgage loan shall be . . . evidenced by a mortgage note.

"(b) The mortgage or mortgage note *may* provide that the interest rate may be increased after 3 years . . . ." (Emphasis supplied.)

It is thus obvious that the increased interest clause is not mandatorily a part of every savings and loan mortgage, but may be included or omitted by the provisions of the mortgage and note as bargained for by the parties.[1]

---

[1] *The Milwaukee Journal,* January 4, 1976, in an article summarizing current real estate lending practices, pointed out that it is the general practice in Milwaukee for savings and loan institutions to omit the provision for an interest increase in exchange for a guaranteed rate, at a slightly higher figure, for

The question to be decided by this court is simply: Did the parties intend to provide for more than one increase in the mortgage rate? If that is permitted by the statute, it was incumbent upon the Association, the scrivener of the instrument, to make clear that such was the bargain to which the debtor bound himself. The Association acknowledges the ambiguity of the mortgage provisions and, therefore, ignores them, relying instead upon the theory that, because the statute authorizes multiple increases, that must have been the intent of the parties.

The fact that the mortgage provisions are ambiguous is fatal to the Association's contention. An ambiguous provision must be resolved against the scrivener—in this case, the Association. *Moran v. Shern* (1973), 60 Wis. 2d 39, 49, 208 N. W. 2d 348. Hence, the most that we can determine with certainty from the mortgage is that an increase in the interest rate is to be permitted. Under this ambiguous and inartful contract, that is all that can be permitted the Association.

While the meaning of the statute may be ambiguous, as the majority opinion states, it is unambiguous in requiring that the interest acceleration provision be set forth in the note or mortgage.

While there are cases where the legislatively expressed public concern is so clear that the police power of the state may impose conditions on contracting parties that they did not contemplate (*State ex rel. Building Owners & Managers Assn. of Milwaukee, Inc. v. Adamany* (1974), 64 Wis. 2d 280, 294, 219 N. W. 2d 274), here, the legislative policy expressed in sec. 215.21 (3) (a) and (b), Stats., required the contractual understanding

the entire term of the mortgage. It is evident that this practice reflects the state of the law—that the right to an interest increase, or multiple increases, results only from the contractual exercise of the power conferred by the statute.

concerning accelerated interest rates to be set forth in the mortgage or mortgage note. A lacuna therein cannot be supplied by a statute which requires implementation by separate and specific contractual provisions. The power conferred by statute upon a savings and loan institution to bargain with a debtor for future interest rate increases must be exercised unambiguously in the instrument which the lending institution drafts.

Only if the contract—the mortgage or the mortgage note—unambiguously permits multiple increases in the interest rates do we face the problem of whether more than one interest rate increase is statutorily permissible. It is the contract that initially controls the rights and obligations of the parties, not the statute. Since the contract is admittedly ambiguous, under every rule of law it must be construed against the Security Savings and Loan Association; and only one increase is permissible. The trial court's judgment in this respect should be affirmed.

I am authorized to state that Mr. Chief Justice WILKIE and Mr. Justice BEILFUSS join in this dissent.