WISCONSIN BANKERS ASSOCIATION, and others, Plaintiffs-Appellants, v. MUTUAL SAVINGS & LOAN ASSOCIATION OF WISCONSIN, Defendant-Respondent.†

Court of Appeals

*No. 77–347. Argued October 25, 1978.—*
*Decided December 29, 1978.*
(Also reported in 275 N.W.2d 130.)

---

[6] *Tanck v. Clerk, Middelton Joint School Dist. No. 3,* 60 Wis.2d 294, 302, 210 N.W.2d 708, 712 (1973).

† Petition to review granted March 26, 1979.

472

474

476

For the plaintiff-appellants, there were briefs by *James P. Brody, Lawrence J. Bugge* and *Thomas L. Shriner, Jr.* of *Foley & Lardner,* Milwaukee, with oral argument by *James P. Brody.*

For the defendant-respondent there were briefs by *Edward A. Dudek* and *James D. Friedman* of *Frisch, Dudek & Slattery, Ltd.,* of Milwaukee, with oral argument by *Edward A. Dudek.*

For the Wisconsin Commissioner of Savings & Loan were amicus curiae briefs by *William R. Hotz, Lowell E. Nass,* assistant attorney general, and *Bronson C. La Follette,* attorney general.

For the Savings League of Wisconsin were amicus curiae briefs by *John K. MacIver* and *W. Charles Jackson* of *Michael, Best & Friedrich,* of Milwaukee.

Before Decker, C.J., Cannon, P.J., and R. W. Hansen, Reserve Judge.

DECKER, C.J.   This appeal presents the issue of the legality of Mutual Savings and Loan Association's Supreme Account II, an account denominated by the respondent as the N.O.W. account. N.O.W. is an acronym for negotiable order of withdrawal. The challenged account is a service by which a savings and loan depositor can authorize payment from his savings account directly to a third party by issuing a negotiable sight draft drawn on his account and payable to the named payee. Mutual Savings and Loan is the first savings and loan association in Wisconsin to offer this service.

Mutual is a state-chartered savings and loan association, deriving its powers from ch. 215 of the Wisconsin Statutes.   In September of 1974, Mutual wrote to the Wisconsin Commissioner of Savings and Loan advising him that it was considering offering Supreme Account II at some future date.   In April, 1976, the Commissioner was notified that Mutual was proceeding to implement the account.   The communication outlined the legal support for the activity, and requested an opinion of the Commissioner with regard to its legality.   On April 16, 1976, the Commissioner responded by a letter in which he concluded that there was an "absence of any prohibition [in the governing statutes] against the form of withdrawal you have proposed" and that the account was therefore legal.

Supreme Account II functions in the following manner. Each Mutual customer intending to utilize the service makes an initial deposit of $100, executes a signature card and an account rules agreement, and receives a supply of sight drafts or payment orders which may be drawn on the Association and against the customer's funds.   The sight drafts provide spaces for the date, name of the

payee, amount of the draft, and the depositor's signature. Once the sight draft is issued, it is collected by presentation to Mutual indirectly through the Milwaukee office of the Federal Reserve Bank of Chicago, with the aid of First Bank-Midland and the use of its member reserve account.[1] When the items are presented on a daily basis for payment, Mutual has until midnight of the day following presentment to advise the Federal Reserve of any item which is not properly payable.

Mutual's depositors who have opened such an account can fill in the drafts, sign and deliver them to the payee in return for goods, services or to obtain cash. The payee can negotiate the item or deposit it with the financial institution that services him for collection from Mutual. The Mutual depositor is provided with a monthly statement indicating the various account transactions.

No earnings are paid on the funds held in the Supreme Account II. The rate of earnings payable on funds held in such accounts was established by Mutual as zero percent.[2] Mutual reserves the right to require thirty days' notice prior to payment of the sight draft,[3] but this requirement is universally waived.

[1] Mutual is not a member of the Federal Reserve System and gains access to the system through utilization of First Bank-Midland's reserve account.

[2] *See* sec. 215.16(2), Stats. Note: 12 U.S.C. §1832 (1976) subjects any depository institution outside of New England to a $1,000 fine per violation for allowing account owners to make withdrawals by negotiable or transferrable instruments for the purpose of making transfers to third parties from "a deposit or account on which interest or dividends are paid." Respondent's brief does indicate that the rate of earnings on Supreme Account II deposits will be revised if the legality of such accounts are upheld and federal restrictions on the payment of interest for such accounts are removed. A proposed regulation to remove this restriction is presently under consideration by the Federal Home Loan Bank Board.

[3] *See* sec. 215.17(4), Stats.

Supreme Account II was first offered by Mutual on May 14, 1976. On May 17, 1976, the Wisconsin Bankers Association (W.B.A.) and two of its members as representative plaintiffs, commenced this class action suit on behalf of its members, and obtained a temporary restraining order pending a hearing on the application for a temporary injunction. Following an evidentiary hearing, the circuit court denied the temporary injunction and dissolved the restraining order.

The action was then advanced for trial. After four days of testimony, the circuit court on August 17, 1977, filed a written opinion concluding that the Supreme Account II was legal and denying the requested permanent injunction. Judgment, dismissing the complaint on its merits, was entered on October 7, 1977, and this appeal followed.

The appellants attack the legality of Supreme Account II on the following bases:

1. Supreme Account II is not a "savings account" and Wisconsin savings and loan associations are not permitted to accept deposits to accounts other than "savings accounts."

2. Wisconsin savings and loan associations do not have an underlying statutory or common law power to pay withdrawals from depositors' accounts on negotiable sight drafts.

3. Wisconsin savings and loan associations are authorized to pay withdrawals only to the "saver" or "owner"; payment on sight drafts effectuates payments to third parties.

We will discuss each basis of attack separately.

*Savings Account*

In the trial court, the appellants presented extensive testimony by an expert witness regarding the meaning

of the phrase "savings account." The primary thrust of the expert testimony was that unless an account is interest bearing it is not a savings account.

As we noted above, the Supreme Account II is presently a noninterest-bearing account. The rate of earnings on such accounts established by the board of directors of Mutual in compliance with sec. 215.16(2), Stats., is zero percent. We do not believe that this feature removes Supreme Account II from the realm of "savings accounts" as defined by Wisconsin statutes regulating savings and loan associations.

Wisconsin savings and loan associations are authorized to accept deposits to and pay withdrawals from savings accounts. Sec. 215.13(1) and (4), Stats. A savings account, for purposes of ch. 215, is defined as "the monetary interest of the owner thereof in the aggregate of savings accounts in the association and consists of the withdrawal value of such interest." Sec. 215.01(24), Stats. Although the board of directors of a savings and loan is required to determine a rate of earnings on the savings accounts held by that institution, and is required to pay those earnings at such times and in such manner as may be prescribed by the Commissioner of Savings and Loans, sec. 215.16(2), Stats., we find no provision prohibiting that rate of earnings being established as zero percent, resulting in a noninterest-bearing "savings account." As Mutual's brief notes, Supreme Account II is not the first noninterest-bearing savings account offered by various savings and loan associations in Wisconsin. It points out that many Christmas Club accounts pay no interest to the saver.

We note that the unique feature of accounts at savings and loan associations is that no account can be established which is not subject to a thirty-day notice require-

ment prior to withdrawal. Under sec. 215.17 (4), Stats., upon presentment of a written withdrawal request, the savings and loan association may pay the requested amount of the withdrawal or may require thirty days' notice prior to payment of such request.[4]

The thirty-day notice requirement is the distinctive feature of savings accounts at savings and loan associations in Wisconsin.[5] Withdrawals from the Supreme Account II, whether made by sight draft or other methods of withdrawal, are subject to this limitation. Although the withdrawal notice may regularly be waived, the requirement of notice is a distinguishing characteristic that differentiates a savings account from a demand deposit.

We hold that Supreme Account II is a savings account under the provisions of ch. 215, Stats., despite the fact that no interest is paid on the account, because withdrawal of funds from the account are subject to a thirty-day notice requirement.[6]

---

[4] Sec. 215.17(4) also provides that withdrawals be paid to the saver. That requirement is discussed *infra*.

[5] The notice requirement is the distinguishing feature between demand and savings deposits under federal banking regulations. *See*, for example, 12 C.F.R. §329.1(e) and 12 C.F.R. 217.1(e). Although it is a violation of federal law for any depository institution outside of New England to allow the owner of a deposit on which interest is paid to make withdrawals by negotiable instrument, 12 U.S.C. §1832(a), interest-bearing accounts at depository institutions in the New England States where such withdrawal procedures are permitted are still classified as savings accounts. 12 C.F.R. §329.1(e)(2) and 12 C.F.R. 217.1(e)(3).

[6] W.B.A. maintains that a savings account is also characterized by payment exclusively to the saver. It asserts that if payment is made to anyone other than the saver, the account is not a savings account. We discuss the requirement that savings and loan associations "pay to the saver" in a subsequent section of this opinion.

## Inherent Power

In its memorandum decision, the trial court found authority for the Supreme Account II in sec. 215.13(37), Stats., which provides that savings and loan associations may "[e]xercise all powers necessary and proper to carry out the purposes of the association." Mutual also asserts that there is a common law right of a person or corporate entity to pay drafts drawn upon that person or entity.

W.B.A. argues that payment of sight drafts drawn on savings and loan associations is neither necessary nor proper to promoting thrift or the ownership of homes.[7] It maintains that never in the history of savings and loan associations in this state has it been necessary for savings and loan associations to pay sight drafts drawn on them by their customers.

Acceptance of that argument would require this court to ignore the highly competitive atmosphere in which banks and savings and loan associations function. Extensive testimony appears in the record indicating the significant impact an innovative service can have in attracting savings dollars to a bank or a savings and loan association.

In a competitive atmosphere, if savings and loan associations are to attract savings dollars to high interest-bearing savings accounts available at their institution and thereby promote "thrift" and, by loaning the savings dollars placed in those accounts, "the ownership of homes," they must provide the innovative services which customers of financial institutions have come to expect.[8] We find this argument to be far more compelling than

---

[7] See 50 Op. Att'y. Gen. 38, 41 (1961) in which it is stated that the purpose of savings and loan associations is to promote "thrift and ownership of homes."

[8] Some of those services are delineated in a subsequent section of this opinion.

W.B.A.'s assertion that because the practice was not necessary to the survival of savings and loan associations for the past eighty-five years, it is not necessary and proper now.

W.B.A. makes a more persuasive argument in asserting that the service asserted to be necessary and proper for the carrying out of the purposes of the association is contrary to the specific prohibitions of sec. 224.03, Stats.

Section 224.03, Stats., makes it illegal for any person or entity other than a commercial bank, a mutual savings bank or a trust company bank "to do a banking business." Sec. 224.02, Stats., defines "banking" and includes within that term accepting deposits "subject to check."

Sec. 403.104(2)(b), Stats., defines "check" and "draft." A draft is an order to pay a sum certain in money which is signed by the maker or drawer and is payable on demand or at a specified time to order or to bearer. A check is a draft which is drawn on a bank and is payable on demand. A check, therefore, is a particular kind of a draft. It is thus indisputable that Supreme Account II sight drafts are not checks and the funds contained therein are not "subject to check" as defined in the Wisconsin Statutes. Although the Supreme Account II program "looks like a check and for all intents and purposes operates like a checking account,"[9] it is a competitive account that is generically similar but specifically different from a bank's statutory checking function.

W.B.A. argues that the foregoing analysis presents a distinction without a difference. Disregarding for the moment the thirty-day notice of withdrawal requirement discussed above, we note the extensive testimony in the record regarding the history of sight drafts by E. Allen Farnsworth, an expert in commercial law and transactions. His testimony indicates that sight drafts were

---

[9] The quotation is from the written opinion of the trial court.

utilized as early as the fourteenth century and checks are a rather recently developed specialized form of sight draft. That testimony also established that at common law any person had the right to pay sight drafts drawn on that person, and such right continues to the present day, absent specific statutory prohibition.

It is argued that sec. 224.03, Stats., is such a specific statutory prohibition. W.B.A. asserts that savings and loan associations are entities with enumerated powers and nowhere in ch. 215, Stats., are savings and loan associations authorized to pay sight drafts drawn on their savings accounts.

We do not agree. The Wisconsin Supreme Court recently placed in perspective the common law and statutorily enumerated powers of Wisconsin savings and loan associations:

This type of association existed at common law and possessed common-law rights. *DeFazio v. Haven Savings and Loan Association* (1956), 22 N.J. 511, 126 Atl.2d 639 . . . .
. . . However comprehensive legislation dealing with these associations, having common-law rights, is regulatory, placing limits on those rights, rather than enabling, or conferring power or authority on the association.[10]

Savings and loan associations possess common law powers and rights, including the right to pay sight drafts drawn upon them. The provisions of secs. 224.02 and 224.03, Stats., prohibiting the savings and loan associations from accepting deposits "subject to check" do not

[10] *Security S.&L. v. Wauwatosa Colony*, 71 Wis.2d 174, 178, 237 N.W.2d 729 (1976). Appellants correctly point out that only three justices concurred in the entire opinion of the court in this case. However, none of the remaining four justices in any way disassociated themselves from the language we quote herein. We consider it an authoritative statement of the law in Wisconsin.

limit that right. If ch. 215, Stats., limits the common-law right of savings and loan associations to pay sight drafts drawn upon them, that limitation is found in secs. 215.17(1) and (4), Stats., which require withdrawals from savings accounts to be paid to the "owners" or the "saver." If those statutes are limitations upon sight draft withdrawals, then authority to honor such instruments cannot be grounded upon the savings and loan association omnibus powers prescribed by sec. 215.13 (37), Stats.

### "Pay to the Saver" Requirement

The most meritorious challenge to the legality of Supreme Account II interposed by W.B.A. is that savings and loan use of sight drafts effectuates payments of withdrawals to third persons in contravention of sec. 215.17(1), Stats. ("The association may pay withdrawals . . . to the owners . . . ."), and sec. 215.17(4)(a), Stats. ("the association . . . shall . . . [p]ay the saver . . . .")

W.B.A. contends that the provisions of secs. 215.17(1) and (4), Stats., have clear and unequivocal meanings requiring no construction whatsoever. The procedure of Supreme Account II by which a third-party payee eventually presents a sight draft to Mutual for payment contravenes the clear meaning of those provisions, according to W.B.A. It further asserts that if construction of that statutory phrase is necessary, the history of the phrase "pay the saver" demonstrates that the Supreme Account II procedure is inconsistent with the evidenced intent of the legislature.

Mutual asserts a number of arguments in support of the legality of the Supreme Account II withdrawal procedure. It states that ch. 215, Stats., is silent as to how a withdrawal can be mechanically accomplished, thus

leaving the customer and Mutual to establish methods of withdrawal by contract. As an adjunct of that argument, it asserts that the power to accept withdrawable deposits implies a power to contract for any method of withdrawal not prohibited by law.

The question before us is whether the procedure of withdrawal established by Mutual is consistent with the statutory mandate to "pay to the saver."

It is argued by Mutual that Supreme Account II withdrawal procedures are entirely consistent with other services which have been offered by savings and loan associations in Wisconsin for many years. The legality of those comparable services has not been questioned, although in each instance, Mutual contends, the comparable service provides for an effective transfer of the savings and loan depositor's funds to a third party. Because we believe each one of those services is distinguishable from a transfer of funds by a negotiable order of withdrawal we discuss them *seriatim*.

1. Customers can receive their withdrawals in the form of an "accommodation check," payable to a third party.

Such a practice requires the presence of the depositor at the savings and loan office. Obviously, his account is debited and a check payable to the depositor and the selected payee, or only to the selected payee, is drawn by the savings and loan association upon its checking account in a servicing bank. As in all the transactions hereinafter discussed, the procedure is the equivalent to a tender of cash to the depositor, followed by retender by the depositor in exchange for a means or method of transfer of cash to the payee. Significantly, however, the accommodation check procedure is attended by the *presence of the depositor and his superintendence of the transaction* whereby his funds are withdrawn from the

depository and converted to an instrument of transfer to the denominated payee.

2. Withdrawals are paid in the form of a money order or traveler's checks, made payable to and intended for negotiation to other parties.

Here, again, the nature of the transaction requires the presence and superintendence of the depositor at the savings and loan office in order to effectuate the withdrawal of funds and convertion into a negotiable or non-negotiable draft or check upon another financial institution or agency.

3. The Transmatic program permits a customer to authorize payment by a savings and loan association directly to a creditor on a recurring basis.

The limited nature of Mutual's Transmatic program is illustrated by the testimony at trial:

In Milwaukee, Transmatic is primarily used to transfer funds from checking accounts in other financial institutions to a savings account at Mutual; also to transfer funds from a checking account to make a loan payment at Mutual; also to transfer from a savings account at Mutual to make a loan payment at Mutual; also to transfer from a savings account at Mutual to another savings account at Mutual. . . . . The direction [by phone] could be for the association to transfer funds from a savings account at Mutual back to the checking account at a commercial bank . . . .[11]

First, we note that a Transmatic transfer from bank to savings and loan association is not prohibited by ch. 215,

---

[11] R. 864–64A. Mutual does not offer a service under Transmatic by which a customer can order a withdrawal and a check, payable to a third party, in an amount equal to that of the withdrawal, which is mailed to the payee. This Transmatic procedure, offered in other states, is commonly referred to as the "bill-paying service," but the record makes clear such a service is not offered by any savings and loan association in Wisconsin.

Stats. Second, we observe that transfers between accounts of the same depositor at the savings and loan association are not third-party transfers. Third, the transfer from a savings and loan depositor's account to the same depositor's account in another financial institution over which the depositor has dominion and control appears to us to literally comply with a statutory admonition to "pay to the saver."

4. Cash Plus Electronic Funds Transfer System permits a customer to effectuate a withdrawal from his savings account while at a retail establishment.

A depositor communicates with his savings and loan association via computer, ordering a withdrawal from his savings account to reimburse a merchant for cash he receives at the establishment. By this transfer method, savings and loan funds deposited in its service bank are transferred to the merchant's account in the same bank. The depositor's account in the savings and loan is debited. The merchant, at the terminal location, physically transfers cash to the savings and loan depositor. The only difference in the transaction from an accommodation check or sale of money order or traveler's check is the long-range character of the transaction because of the computer terminal and the intrabank computer transfer of funds. We view the computer terminal as an electronic extension of the savings and loan teller. Through the "long arm" of the computer terminal, a transaction can be initiated at a location far from the savings and loan office and almost simultaneously consummated at the recordkeeping center of the savings and loan. The transaction differs from a telephone call because entry to the computer terminal is protected by a card coding device. Essentially, the procedure is no different from the accommodation check and check or money order sales described above which occur in the office of the savings and loan in the immediate proximity of a bookkeeping

machine. To utilize the computer terminal, the depositor's presence at its location is required with the necessary encoded entry device. Although the computer terminal permits the transaction to be initiated and consummated at locations remote to the office of the savings and loan association, the depositor's presence at the computer terminal and his superintendence of the transaction characterizes the nature of the procedure.

5. Prestige Emergency Cash Program permits a customer to enter a participating association anywhere in the United States, present a Prestige card, complete the necessary forms and, upon telephone verification from Mutual, obtain cash from the participating association. That association is subsequently reimbursed by a Mutual check, drawn on a commercial bank, payable to the order of the association.

There is virtually no difference in this type of transaction from the Cash Plus Electronic Funds Transfer System. A telephone line voice communication is utilized in place of a data processing terminal.[12] Nonetheless, the transaction requires the depositor's presence at the affiliated association and superintendence of the transaction whereby the depositor receives payment from an affiliated association that is merely a disbursing agent for the depositor's association.

We believe that the transactions discussed above involve the direct participation and superintendence of the savings and loan association depositor and are in compliance with the statutory admonition that withdrawals must be paid to the saver or owner.

In *American Bankers' Ass'n. v. Connell,* 447 Fed. Supp. 296, 299 (Dist. Ct. D.C., 1978), the court brushed

[12] In April, 1975, the Federal Reserve Board adopted an interpretation of Regulation Q that permits a depositor to withdraw funds by telephone from a bank savings account at an insured bank.

away a distinction between credit union share drafts and other withdrawal methods similar to those described above. However, in refusing to distinguish between those withdrawal transactions, the court specifically noted with respect to the credit union accommodation withdrawals with which share drafts were compared that "it is not necessary that members make their withdrawals in person." That is a difference from accommodation withdrawals practiced in Wisconsin.

Although the Maryland Court of Appeals swept aside the distinction between accommodation checks, money orders, cash payments and checks drawn upon a savings bank as "a distinction without a difference," *Savings Bank of Baltimore v. Bank Commissioner*, 237 A.2d 45, 53 (1968), heavy reliance was placed upon a century-old practice of that bank in offering checking accounts to some of its depositors.

We find the five kinds of withdrawals detailed above distinguishable from N.O.W. drafts and without precedential value to establish an administrative construction of the statute favorable to Mutual's position.

The primary thrust of two *amicus curiae* briefs filed in support of Mutual's position by the Wisconsin Commissioner of Savings and Loan Associations and the Savings League of Wisconsin is to assure continued validation of the withdrawal practices described above. Our decision does not cast doubt upon the validity of those practices which we find to be in compliance with the provisions of sec. 215.17 (1) and (4), Stats.

Mutual has asserted two additional arguments to support its position. First, it notes that in sec. 223.03, Stats., trust company banks are prohibited from receiving "deposits subject to draft order or check." If the legislature had intended to prohibit savings and loan associations from paying withdrawals on sight drafts, it contends, the direct language in ch. 223, Stats., could have been

utilized rather than leaving the prohibition to be inferred from the phrase "pay to the saver." Second, Mutual argues that the interpretation of the Commissioner of Savings and Loans is entitled to great deference in construing this statutory provision.

In its reply brief, W.B.A. maintains that the specific language of ch. 223, Stats., regarding payments on sight drafts by trust banks was necessitated by the fact that trust banks may engage in the business of banking, while savings and loan associations cannot, and thus the more specific prohibition was necessary.

The W.B.A. also cautions that the statutory reserve requirements for savings and loan associations are insufficient when viewed in light of the volatility which their deposits will take on if they are subject to withdrawal by sight draft.[13] Long-term mortgage commitments should not be supported by demand deposits, according to the appellants. However, we find the supervisory authority of the Commissioner of Savings and Loan (sec. 215.03(1), Stats.) and his rule-making authority (sec. 215.02(7), Stats.) sufficient to provide for the safe and sound operation of an association.

We find it difficult to accord deference to the Commissioner's approval of the transaction practice. Although the approval is express, it appears to be more of a negative "hands off" action, rather than a positive act that evidences supervision and regulatory control. Although Mutual notified the Commissioner one and one-half years before it requested his approval and implemented the negotiable orders of withdrawal, no regulations or supervisory practices were promulgated.

---

[13] In Wisconsin, commercial banks are required to maintain 12% of their total deposits as reserves, with more stringent reserve requirements on demand (checking) deposits. Sec. 221.27, Stats.

Additionally, an administrative statutory construction by the enforcing authority is entitled to much less weight if that construction is of recent origin, *State ex rel. Strykowski*, 77 Wis.2d 322, 253 N.W.2d 434 (1978); and it is of no significance if the statute is unambiguous, *Arnans v. Department of Health & Social Services*, 77 Wis.2d 322, 236 N.W.2d 279 (1977). We find the statute unambiguous.

Construction of secs. 215.17(1) and (4), Stats., is a question of law. *Robinson v. Kunach*, 76 Wis.2d 436, 251 N.W.2d 449 (1977); *City of Milwaukee v. Wisconsin Employment Relations Commission*, 71 Wis.2d 709, 239 N.W. 2d 63 (1976). The aim of all statutory construction is to discern the intent of the legislature. *Woczorek v. City of Franklin*, 82 Wis.2d 19, 260 N.W.2d 650 (1978); *Milwaukee County v. Department of Industry, Labor & Human Relations Commission*, 80 Wis.2d 445, 259 N.W. 2d 118 (1977); *Stryker v. Town of LaPointe*, 52 Wis.2d 228, 190 N.W.2d 178 (1971). In construing the requirement that savings and loan associations pay withdrawals to the saver or owner, the entire section in which the questioned language is found must be construed. *Omernik v. State*, 64 Wis.2d 6, 218 N.W.2d 734 (1974).

The deposit of funds in a savings and loan association creates a relationship of debtor-creditor between the association and the depositor. The account "is a chose in action of the depositor against the bank."[14] We believe the development of the law, both common law and statutory enactments, demonstrates a continually growing flexibility in the relations between financial institutions and their depositors respecting those choses in action.

Early common law, with the exception of the law merchant, established a principle that a chose in action

---

[14] *Anderson Nat. Bank v. Luckett*, 321 U.S. 233, 248 (1944).

could not be assigned. Equity courts soon began to recognize the assignability of a chose in action arising *ex contractu*,[15] and courts of law soon recognized that principle.[16]

The sight draft is a centuries-old commercial instrument which evolved before the existence of modern banks. It was a commercially efficient method of assigning choses in action which effectuated the transfer of funds by a method which increased safety and reduced the hazard of loss by theft or robbery.[17] As the modern system of banking developed, a form of sight draft was specifically tailored to the banking system and became known as a check. That evolution, however, did not extinguish the sight draft; it accomplished the development of a supplementary commercial instrument—the bank check.

This trend toward flexibility in the relations of financial institutions and their depositors was confirmed and further facilitated in the development of the Uniform Commercial Code. The Uniform Commercial Code-Commercial Paper [*see* sec. 403.101, Stats.] provides an elaborate regulatory scheme governing the use of negotiable instruments evidencing an intent to facilitate the free movement of these instruments in commercial channels. The use of sight drafts in those commercial channels was recognized by the legislature in enacting this legislation.[18]

---

[15] *See, e.g., Christmas v. Russell,* 14 U.S. (Wall.) 69 (1871).

[16] *Welch v. Mandeville,* 1 U.S. (Wheat.) 233 (1816).

[17] We do not maintain that the sight draft utilized in Supreme Account II effectuates an assignment of funds on deposit and subject to withdrawal by such drafts. Sec. 241.25, Stats., specifically states that no assignment occurs. We simply point out that the use of sight drafts was a step toward greater commercial flexibility for financial institutions and their customers.

[18] Sec. 403.104(2)(b), Stats.

Utilization of the sight draft as a commercial instrument for the benefit of savings and loan association depositors is an innovation of the decade of the 1970's. Adaptation of the sight draft to savings and loan business practices was not envisioned by the legislature when ch. 215, Stats., and the Uniform Commercial Code were adopted by the legislature of Wisconsin.[19] Nevertheless, this adaptation is consistent with the trend both the legislature and courts have evidenced in considering the transferability of interest in choses in action.

The application of secs. 215.17(1) and (4), Stats., in a manner that would prohibit the use of a centuries-old commercial instrument in a new and innovative manner in the savings and loan business would be a giant step backward into an era of English common law when an assignee of a chose in action could not sue in his own name. Such a restrictive interpretation ought to be accompanied by the sounds of swords clashing on armor, considered in the light of the elimination of the restrictions on the alienation of property, and rejected by reason of our political and economic evolution from serfdom to free man.

We consider that such a restrictive interpretation, with its obvious anticompetitive effects, should be based only upon language that strictly requires such an interpretation. Language which would specifically require this interpretation was available if the legislature desired to utilize it. Congress, in prohibiting the utilization of sight draft withdrawal procedures, left no doubt as to its intent to proscribe the use of these instruments by federal savings and loan associations. 12 U.S.C. §1464(b)

---

[19] Revision of the regulatory legislation of savings and loan associations and the adoption of the Uniform Commercial Code occurred almost simultaneously. See 1963 Wis. Laws, chs. 158 and 315.

(1) (1976) provides in pertinent part: "Savings accounts shall not be subject to check *or* to withdrawal on negotiable or transferable order or authorization to the association . . . ." [Emphasis supplied.] The Wisconsin legislature has utilized similar language in specifically restricting the power of trust companies. "Such corporation . . . shall not receive deposits *subject to draft order* or check . . . ." [Emphasis supplied.] Sec. 223.03 (11), Stats. A return to the fourteenth century has not been directed by the legislature.

Section 215.17 (4), Stats., provides for sequential withdrawal of funds in the event the demands for withdrawal exceed the redemption capacity of the savings and loan association. A right to withdrawal of funds by a savings and loan depositor is a particular and distinguishing characteristic of the structure of a savings and loan association. Historically, investment in a savings and loan association was considered relatively long-term because depositors' funds were usually invested in long-term loans. Nonetheless, that concept was balanced by a right to withdrawal counterbalanced by the sequential withdrawal provisions. At the time of the development of those concepts, investments by depositors were known as share accounts.

Economic chaos of the decade of the 1930's highlighted the fact that savings and loan association withdrawals were not like demand deposits or even time deposits in other more liquid financial institutions. The widespread residential mortgage loan defaults, the principal nature of savings and loan business (they were called building and loans then), made most associations illiquid and unable to generally respond to withdrawal requests. Banks, also, found it difficult to respond to withdrawal of time deposits and, in some instances, demand deposits.

That chaotic period resulted in federal insurance for banks and savings and loan associations as well as the

establishment of federal lending agencies that made financial institutions able to withstand the vagaries of economic cycles. With those developments came the emphasis in the savings and loan industry upon the savings character of its associations. The economic expansion and financial reforms reduced the liquidity problems and the savings and loan industry sought to compete more effectively with banks for savings dollars. Name changes to "savings and loans" from "building and loans" and to "savings accounts" from "share accounts" resulted.[20] The distinguishing sequential withdrawal characteristic was retained.

We are unable to find in the sequential withdrawal provision some inhibition or restriction on the use of negotiable orders of withdrawal. A review of the statutory withdrawal provisions of the Northeastern states of Maine, Massachusetts, Vermont, New Hampshire, Rhode Island and Connecticut[21] establishes that the same sequential withdrawal provisions exist in those states side by side with statutory authority to issue negotiable orders of withdrawal or checks. Therefore, we need only consider the absence of express statutory authority to utilize sight drafts. The absence of express authority is immaterial because the Wisconsin Supreme Court has characterized the provisions of ch. 215, Stats., as regulatory rather than restrictive of the powers necessary and proper to engage in the savings and loan business.[22]

---

[20] *See Wisconsin Bankers Association v. Robertson,* 294 F.2d 714 (D.C. Cir. 1961), *cert. denied,* 368 U.S. 931 (1961).

[21] *See*: Me. Rev. Stats. tit. 9–B, ch. 42, §424; Mass. Gen. Laws Ann. ch. 167, §16–A (West); Vt. Stat. Ann. tit. 8, §1861(c); N.H. Rev. Stat. Ann. §386:34; R.I. Gen. Laws §19–23, 1–16; Conn. Gen. Stat. §36–182a and §36–104K. Illinois also has adopted legislation authorizing N.O.W. accounts. Appendix at 205.

[22] *See Security S. & L. v. Wauwatosa Colony, supra.*

A declaration of legislative policy in favor of business competition and opposing restraint of trade is found in sec. 133.01, Stats. One wonders whether the circumstances surrounding this and related cases provide an outline for a sequel to "Alice in Wonderland." In the instant case a bankers' trade association seeks to invalidate a savings and loan competitive practice permissible for banks since November 1, 1978. In a related case in the District of Columbia, a savings and loan association trade association attacks the regulations that would permit banks to do what is proposed to be done by savings and loan associations here in Wisconsin. Meanwhile in the Northeastern states, banks and savings and loan associations will compete vigorously by each doing what is sought to be prohibited to the other in less favored parts of the nation.

In the Northeastern states the customers benefit. In the rest of the nation the regulators and legal system combine in an elephantine obstruction to competitive progress. Much of the regulatory thicket has been or will be cut down by the Federal Reserve Board regulation and a proposed Federal Home Loan Bank Board regulation providing for use of bank savings accounts (which bear interest) to cover withdrawals by check and use of third-party withdrawal orders upon savings and loan accounts (which bear interest). A Wisconsin regulatory provision should not be construed in a manner that will constitute it another hedgerow line of resistance to reasonable competitive practices.

The goal of regulation of financial institutions by the state is self-evident from the regulatory statutes—financial and business integrity for the protection of customers and depositors. If those regulatory goals are kept in mind, we are unable to conclude that regulations such

as secs. 215.17 (1) and (4), are designed to change the fundamental debtor-creditor relationship of the savings and loan association to its depositor. The Wisconsin Supreme Court has described the relationship between a bank and its depositor:

The deposits made by the plaintiffs constituted the bank their debtor in the amount represented by the aggregate deposits, less such amounts as had been paid by the bank to the plaintiffs or to others upon their authorization.[23]

If one keeps in mind the struggle in the common law to effectuate the assignability of choses in action and enable an assignee to assert his rights against the debtor, it seems highly unlikely that it was the intent of the legislature to take a regressive step nullifying the modern development of flexible commercial instruments.

We have noted the distinction between a draft and check,[24] the restriction of the checking function to banks, and the compartmentalized legislative treatment of state financial institutions. We deem it accurate to note the definite economic distinction between a bank and a savings and loan association or a bank and a credit union. There seems to be no basis for an economic distinction between a savings and loan association and a credit union in spite of the differences in the thrust of the kind of lending performed.

Eighteen months ago the Wisconsin Commissioner of Credit Unions authorized a system of off-premises withdrawals for Wisconsin credit unions that is fundamentally the same as the negotiable orders of withdrawals but are called "share drafts." The applicable provisions of

---

[23] *Peart v. Schwenker,* 200 Wis. 200, 202, 227 N.W. 945 (1929). *Also see Wussow v. Badger State Bank,* 204 Wis. 467, 470, 234 N.W. 720, *reh. denied* 236 N.W. 687 (1931); *Huber Glass Co. v. First National Bank of Kenosha,* 29 Wis.2d 106, 138 N.W.2d 157 (1965).

[24] Sec. 403.104(2)(a) and (b), Stats.

the chapter of the statutes regulating credit unions permits a credit union to prescribe by its bylaws "conditions on which accounts may be . . . withdrawn." Sec. 186.05 (3), Stats. In addition, sec. 186.113(5), Stats., permits a credit union to "[i]ssue third-party checks upon request of the member." If the position advocated by W.B.A. is adopted, credit unions would be treated differently from savings and loan associations—a distinction for which we can find no sound basis. Admittedly, the function of this court is to apply and interpret the statutes enacted by the legislature and not engage in an *ad hoc* economic construction that substitutes the judgment of the court for the act of the legislature. However, we find it inconceivable in the light of newly adopted Federal Reserve Board regulations which will permit banks to transfer funds automatically from interest-bearing savings acounts to cover checks written prior to the transfer, in the light of the Federal Home Loan Bank Board's proposed regulation to authorize federal savings and loan associations outside the Northeastern states area to issue negotiable orders of withdrawal and in the light of the authorization of Wisconsin credit unions for the past three years to issue the same kind of commercial instrument called a share draft, that the legislature ever intended that competition and opportunity between these kinds of financial institutions should be severely restricted and disadvantaged.

W.B.A. urges that sec. 215.17, Stats., in requiring payment of withdrawals to the "saver" or "owner" necessarily implies an intent on the part of the legislature to proscribe payments to third parties upon the presentation of a sight draft signed by the saver or owner. This assertion is buttressed by pointing out that the legislature could have utilized "pay to the order" of the saver if the withdrawal method at issue had been envisioned. W.B.A. correctly states that the distinction between "pay

to" and "pay to the order" is "a longstanding one in the law." We agree. However, the interpretation placed upon the "pay to" language of sec. 215.17 by W.B.A. is far more restrictive than is warranted by the legal and commercial history of that phrase.

The longstanding distinction between the phraseology "pay to" and "pay to the order" to which reference is made is simply one of negotiability of an instrument containing "pay to the order" as opposed to simply "pay to."[25] The transferee of a negotiable instrument, if he meets the requisites to attain the status of a holder in due course,[26] takes the instrument free of any claim to it on the part of any party and free of most defenses of any party to the instrument.[27]

To say that an instrument which contains only the phrase "pay to" is not negotiable, however, is not to say that it cannot be transferred. The transferability of such an instrument has been recognized from the earliest times. Beutel[28] points out suits by assignees of instruments bearing only the phrase "pay to" in the Jewish Exchequer as early as 1268. The transferee of a non-negotiable instrument, however, takes subject to the claims and defenses of parties to that instrument.[29]

[25] See *Carruth v. Walker*, 8 Wis. 103 (1858).

[26] Sec. 403.302 (1) (a), (b), (c), Stats.

[27] Sec. 403.305, Stats.

[28] See Beutel, *The Development of Negotiable Instruments in Early English Law* (1938), 51 Harv. L. Rev. 813, 817–18. *Also see* Beutel, *Colonial Sources of Negotiable Instruments Law in the United States* (1939), 34 Ill. L. Rev. 137; *Carruth v. Walker, supra.*

[29] Sec. 403.306, Stats. "As between the original parties there is no difference between a note payable to X and one payable to the order of X; the difference appears only after the note comes into the hands of a holder in due course, at which time the

Clearly, the history of the use of "pay to" in commercial instruments does not warrant the restrictive interpretation urged by W.B.A. The statutory use of that phrase does not evidence an intent on the part of the legislature to proscribe the Supreme Account II system of withdrawal. In adopting the Uniform Commercial Code the legislature expressed its intention to "permit the continued expansion of commercial practices through custom, usage and agreement of the parties."[30] It was also provided that the principles of the law merchant continued to be valid "unless displaced by the particular provisions of [the] code."[31] It is well established in the law merchant that an instrument directing payment to a specified person only is transferable, the transferee taking subject to claims and defenses of parties to the instrument.

An interpretation of the statutory provision "pay to the saver" in sec. 215.17, Stats., as a restriction on payment to a third party is not warranted by its commercial and legal history, and is in contravention of the legislature's expressed intent to "permit the continued expansion of commercial practices through custom, usage and agreement of the parties."

We believe that the concept of assignability of choses in action, the debtor-creditor relationship between the savings and loan association and its depositor, and the announced policy of business competition leads to the

---

latter note, being negotiable gives the holder a right of action free of certain defenses against X, while the former being non-negotiable, does not. *Bickart v. Greater Arizona Savings and Loan Ass'n.*, 103 Ariz. 166, 438 P.2d 403, 405 (1968).

[30] Sec. 401.102(2)(b), Stats.
[31] Sec. 401.103, Stats.

conclusion that the legislature's provision that savings and loan depositor withdrawals be paid to the saver or owner is expressly complied with when a depositor's draft, made payable to a third person, is honored by the savings and loan association upon which the draft is drawn.

*By the Court.*—Judgment affirmed.